Argued and submitted March 4, at Lewis & Clark Law School, Portland, Oregon; decision of Court of Appeals reversed, order of Board of Parole and Post-Prison Supervision reversed, and case remanded to Board of Parole and Post-Prison Supervision for further proceedings October 24, 2019

# PRENTICE PENN,
*Petitioner on Review,*

*v.*

# BOARD OF PAROLE AND POST-PRISON SUPERVISION,
*Respondent on Review.*

## (CA A162458) (SC S065950)

451 P3d 589

When petitioner was released from prison to post-prison supervision, the Board of Parole and Post-Prison Supervision included a special condition in its supervision order requiring that petitioner not enter into or participate in any intimate relationship or encounters with any person without prior written permission from his supervising officer. Petitioner requested review of the special condition by the board, arguing that it was unconstitutionally vague and overbroad and that the board lacked authority under the relevant statute, ORS 144.102(4)(a), to impose it. After those arguments were rejected by both the board and the Court of Appeals, petitioner sought and obtained judicial review by the Oregon Supreme Court. While that review was still pending, petitioner was released from post-prison supervision, and the board moved to dismiss the review as moot. Petitioner argued, however, that, although moot, his case was reviewable under ORS 14.175, because he was challenging an act of a public body that is capable of repetition but likely to evade judicial review in the future. The court took the reviewability issue under advisement. *Held*: Petitioner's challenge to the special condition was reviewable under ORS 14.175, and the court would exercise its discretion under that statute to decide it despite its mootness. On the merits, the board acted outside of its statutory authority under ORS 144.102(4)(a) by imposing the special condition on petitioner.

The decision of the Court of Appeals and the order of the Board of Parole and Post-Prison Supervision are reversed, and the case is remanded to the Board of Parole and Post-Prison Supervision for further proceedings.

En Banc

On review from the Court of Appeals.*

Anna Belais, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the

_____

* Judicial review of a final order of the Board of Parole and Post-Prison Supervision. 290 Or App 935, 415 P3d 597 (2018).

briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender.

Christopher Page, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

NAKAMOTO, J.

The decision of the Court of Appeals is reversed. The order of the Board of Parole and Post-Prison Supervision is reversed, and the case is remanded to the Board of Parole and Post-Prison Supervision for further proceedings.

## NAKAMOTO, J.

When petitioner was released from prison to post-prison supervision, the Board of Parole and Post-Prison Supervision included a special condition in its supervision order requiring that petitioner not "enter into or participate in any intimate relationship or intimate encounters with any person (male or female) without the prior written permission" of his supervising officer. On review, petitioner raises two issues: first, whether the board lacked statutory authority to impose the condition and, second, whether the condition is unconstitutional under the Due Process Clause of the Fourteenth Amendment because it is vague or overbroad.

Preliminarily, reviewability is also at issue. After petitioner filed his opening brief, the board moved to dismiss based on mootness. The board noted that petitioner had completed his term of post-prison supervision and no longer was subject to the challenged condition; therefore, the board argued, a decision would no longer have a practical effect on petitioner's rights and the case should be dismissed. Petitioner opposed dismissal, noting cases in which the board has imposed that special condition on other people under post-prison supervision, in accordance with its decision at a 2012 public meeting that it may impose the condition in the future. We took the motion under advisement.

We now hold that, although petitioner's appeal is moot, it is one that can and should be decided under ORS 14.175, which provides an exception to the general rule— that moot cases should be dismissed—for cases in which a party alleges that an act, policy, or practice of a public body is contrary to law. On the merits of petitioner's appeal, we hold that the board exceeded the scope of its statutory authority in imposing the special condition on petitioner.

## I.   BACKGROUND

The facts that are relevant to our review are not in dispute and are taken from the board's final order. In 2010, petitioner was charged with crimes after he violently assaulted and threatened a woman he had been dating, using weapons, to compel her to perform a sex act. The incident was just one of several similar incidents that had

occurred during petitioner's longstanding relationship with her. Petitioner ultimately pleaded no contest to two of the charges—attempted first-degree kidnapping constituting domestic violence and attempted second-degree assault constituting domestic violence. The trial court entered a judgment of conviction on those charges and sentenced petitioner to 84 months in prison, to be followed by 36 months of post-prison supervision.

Upon his release from prison, petitioner received an order listing the conditions of his post-prison supervision, as required by ORS 144.102(1). Although the board ultimately was responsible for setting the conditions of petitioner's post-prison supervision, they were the product of a statutorily required process that began with the Department of Corrections. Under ORS 144.096(1)(a), the department must prepare a proposed release plan for an inmate and submit it to the board. The proposed release plan must include "recommended conditions of post-prison supervision," "[a]ny other conditions and requirements as may be necessary to promote public safety," and "[a]ny conditions necessary to assist the reformation of the inmate." ORS 144.096(3)(b), (d), (f). Then the board must approve the proposed release plan, or a revised version of it, before the inmate's release, ORS 144.096(1)(b), (c), and must provide a copy of the conditions imposed through the release plan to the inmate upon his or her release, ORS 144.102(1).

The conditions imposed "may" include any of a specified list of general conditions set out in ORS 144.102(2), and for certain sex offenders, specified conditions set out in ORS 144.102(3) and ORS 144.102(4)(b) must be imposed. Additionally, the board is authorized under ORS 144.102 (4)(a) to "establish special conditions that the board * * * considers necessary because of the individual circumstances of the person on post-prison supervision."

The board-approved supervision conditions in the order that petitioner received included the general conditions set out in ORS 144.102(2) and several special conditions, including the one at issue that regulates petitioner's "intimate" relationships and encounters. With the assistance of legal counsel, petitioner requested review of the

order. He argued that that special condition, identified in the order as Supervisory Condition 10 (SC 10), could not lawfully be imposed and should be stricken. Petitioner contended that SC 10 was outside the board's statutory grant of discretion, was not supported by substantial evidence in the record, and was "an unconstitutional violation of the right to privacy" and "vague and overbroad."

In the ensuing administrative review, petitioner submitted an affidavit, written by his fiancée, who was the mother of his two sons, for the board's consideration. In that affidavit, his fiancée averred that petitioner had never assaulted her or their sons and that her relationship with him was based on "clear boundaries" and "appropriate verbal, physical and sexual behavior." She further averred that, if SC 10 were to remain in effect, it would prevent her and petitioner from having a healthy and functional marriage and would prevent petitioner from fulfilling his roles as husband and father.

The board denied the requested relief in a final administrative order. After describing in detail the "vicious assault" petitioner had perpetrated against "a woman you had been dating and with whom you shared an intimate relationship," the board concluded that it was

> "in the interest of public safety and your reformation for your supervising officer to monitor any intimate relationships and/or intimate encounters. It was these individual circumstances that led the board to impose [SC 10]."

The board further noted that the condition was not an absolute prohibition on petitioner engaging in intimate relationships; rather, it allowed petitioner's supervising officer to "monitor and evaluate each situation to determine whether [the] association is appropriate for your rehabilitation and is consistent with public safety." The board's order concluded by advising petitioner that he had exhausted his administrative remedies and could petition the Court of Appeals for judicial review of the order.

Petitioner timely sought judicial review in the Court of Appeals, raising the same arguments that he had raised before the board. The Court of Appeals affirmed without

opinion. Petitioner then petitioned for review in this court, arguing (1) that SC 10 was outside the range of discretion delegated to the board by statute and (2) that SC 10 is unconstitutionally vague and overbroad. This court allowed the petition.

Midway through the proceedings before this court, petitioner was discharged from post-prison supervision and filed a notice informing the court of that fact and of his understanding that the discharge likely had rendered his appeal moot. Petitioner suggested, however, that the case could and should be decided without regard to its mootness, as permitted by ORS 14.175. That statute provides that a court may decide a challenge to the lawfulness of an act, policy, or practice of a public body, even one that no longer has a practical effect on the party bringing the challenge, as long as (1) that party had standing to commence the action; (2) the challenged act "is capable of repetition" or the policy or practice continues in effect; and (3) the policy, practice, or similar acts "are likely to evade judicial review in the future."

The board subsequently moved to dismiss petitioner's appeal. The board argued that its imposition of the challenged condition was not an act that was "capable of repetition" but "likely to evade judicial review" within the meaning of ORS 14.175 and that the appeal did not otherwise meet the prudential requirements for reviewing a moot action. We took the board's motion for dismissal under advisement, to be decided before consideration of the parties' arguments on the merits. We turn to that motion now.

## II.   MOTION TO DISMISS

Petitioner acknowledges, and we agree, that, given that petitioner no longer is subject to the supervisory condition that he challenges, a decision by this court in the matter will not have a practical effect on his rights—in other words, his appeal is moot. *See Eastern Oregon Mining Association v. DEQ*, 360 Or 10, 15, 376 P3d 288 (2016) (case in which a court's decision "no longer will have a practical effect on or concerning the rights of the parties" is moot). However, that does not necessarily mean that the board's motion to dismiss

must be granted. At least in cases like the present one, in which the act of a public agency is challenged as contrary to law, this court "may" decide the case even when a decision would have no practical effect on the party who brought it, assuming the requirements set out in ORS 14.175 are satisfied.[1] On the other hand, courts are not *required* to decide any and every moot case that falls within the terms of ORS 14.175. As this court recognized in *Couey v. Atkins*, 357 Or 460, 522, 355 P3d 866 (2015), insofar as the statute uses the permissive term "may," it "leaves it to the court to determine whether it is appropriate to adjudicate an otherwise moot case under the circumstances of each case."

At least initially, then, the issue regarding dismissal of petitioner's appeal boils down to two questions: (1) Does the appeal satisfy the requirements of ORS 14.175? (2) If so, should the court exercise its discretion to decide the appeal?[2] We answer both questions in the affirmative and deny the motion.

A.   *ORS 14.175*

The text of ORS 14.175 is the necessary starting point for answering the first question. *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009) ("text and context remain primary" in construing a statute). The statute, which has remained unchanged since its enactment in 2007, provides:

> "In any action in which a party alleges that *an act, policy or practice of a public body*, as defined in ORS 174.109, or

---

[1] Any questions about the *constitutional* authority of courts to decide moot cases that meet the requirements of ORS 14.175 have been resolved by *Couey v. Atkins*, 357 Or 460, 520, 355 P3d 866 (2015). *Couey* held that ORS 14.175 does not run afoul of the limitations on "judicial power" conferred on the courts in Article VII (Amended), section 1, of the Oregon Constitution by authorizing courts to entertain public actions that, although moot, are capable of repetition yet likely to evade review.

[2] Petitioner argues, and we agree, that ORS 14.175 does not necessarily represent the full scope of a court's constitutional authority to decide moot cases. *See generally Couey*, 357 Or at 520-22 (Article VII (Amended), section 1, of the Oregon Constitution does not require dismissal when "public actions cases or cases involving matters of public interest" become moot; court need not determine the outer limits of what constitutes a "public action" or "case involving matters of public interest" to determine that cases that meet the requirements of ORS 14.175 are covered). In this case, however, there is no need to look beyond ORS 14.175 for authority to decide petitioner's appeal despite its mootness.

of any officer, employee or agent of a public body, as defined in ORS 174.109, is unconstitutional or is otherwise contrary to law, the party may continue to prosecute the action and the court may issue a judgment on the validity of the challenged act, policy or practice even though the specific act, policy or practice giving rise to the action no longer has a practical effect on the party if the court determines that:

"(1)   The party had standing to commence the action;

"(2)   *The act challenged by the party is capable of repetition*, or the policy or practice challenged by the party continues in effect; and

"(3)   The challenged policy or practice, or *similar acts, are likely to evade judicial review in the future*."

(Emphases added.)

There is no dispute over the first requirement set out in the statute: When petitioner commenced the present action, he was subject to SC 10 and had standing to challenge its lawfulness. Neither is there any argument that the statute's overarching requirement—that the action be one in which "a party alleges that an act, policy or practice of a public body *** is unconstitutional or contrary to law"—is not satisfied.[3] Rather, the dispute centers on the requirements at ORS 14.175(2) and (3) that the challenged act be "capable of repetition" and that "similar acts" likely will "evade judicial review."

  1.  *Act "capable of repetition"*

The board contends that its "act" of imposing SC 10 on petitioner is not "capable of repetition" or "likely to evade

_____

  [3] The parties *do* disagree about whether petitioner is challenging the lawfulness of a "policy" or "practice" of the board, in addition to an "act." In petitioner's response to the board's motion to dismiss, he provides minutes from the board's January 26, 2012, public meeting stating that the board "unanimously agreed to add back into Special Condition #10" the wording of SC 10 "for domestic violence convictions, assaults or any other case where they feel it is necessary for public safety." Though the board "does not dispute that it has imposed" SC 10 in "other cases involving domestic violence conditions," it contends that the minutes do not reflect its policy or practice but instead reflect the adoption of wording for the board's use in exercising its discretion. The board further argues that petitioner has never challenged a board policy or practice in imposing SC 10. Because we decide this case based on the board's imposition of SC 10 as an act capable of repetition, we do not resolve petitioner's "policy or practice" issue.

judicial review" within the meaning of ORS 14.175(2) and (3). The board argues that, when the legislature enacted ORS 14.175, it "borrowed and codified" the common-law "capable of repetition" doctrine first recognized and developed in federal cases, *see Couey*, 357 Or at 480 (so stating), and that it is appropriate to rely on federal cases in determining the legislature's intentions with respect to the scope and application of ORS 14.175.

Under most of the federal cases that define the doctrine, the board observes, an act is deemed to be "capable of repetition" only if there is a "reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 US 147, 149, 96 S Ct 347, 46 L Ed 2d 350 (1975). *See also Federal Election Com'n v. Wisconsin Right to Life, Inc.*, 551 US 449, 463, 127 S Ct 2652, 168 L Ed 2d 329 (2007) (*capable of repetition exception requires reasonable expectation or demonstrated probability that the same controversy will recur involving the same complaining party*); *Murphy v. Hunt*, 455 US 478, 482, 102 S Ct 1181, 71 L Ed 2d 353 (1982) (same).[4] Furthermore, the board observes, federal courts have not found the required "reasonable expectation that the same complaining party would be subjected to the same action again" when some specified misconduct on the complaining party's part is a necessary precondition for such repetition. *See Honig v. Doe*, 484 US 305, 319, 108 S Ct 592, 98 L Ed 2d 686 (1988) ("[F]or purposes of assessing the likelihood that state authorities will reinflict a given injury, we generally have been unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury."). *See also Murphy*, 455 US at 482-83 (in challenge to denial of pre-trial bail, finding insufficient probability that same complaining party would once again be in a position to demand bail); *City of*

---

[4] The cited decisions—and most modern federal cases on the subject—articulate a two-part test for when the "capable of repetition yet evading review" doctrine may operate to save a moot case from dismissal:

"(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again."

*Weinstein*, 423 US at 149.

*Los Angeles v. Lyons*, 461 US 95, 105-08, 103 S Ct 1660, 75 L Ed 2d 675 (1983) (no expectation that party seeking injunction against police use of chokeholds would be stopped in the future for a criminal offense and, if stopped, would provoke use of chokehold); *O'Shea v. Littleton*, 414 US 488, 497, 94 S Ct 669, 38 L Ed 2d 674 (1974) (in challenge claiming discrimination in bond setting and sentencing, court concluded that "attempting to anticipate whether and when these [same] respondents will be charged with crime and will be made to appear before either petitioner takes us into the area of speculation and conjecture").

Applying those principles from the federal cases to the present circumstances, the board asserts that any expectation that petitioner himself would again be subjected to a condition like SC 10 must rest on a string of assumptions the likes of which the federal courts consider speculative: that petitioner will commit and be convicted of another crime, that he will receive a sentence that includes a period of post-prison supervision, and that the board will use its discretionary authority under ORS 144.102(4)(a) to impose a special condition that is the same or similar to SC 10. In such circumstances, the board concludes, there can thus be no "reasonable expectation" that the "same complaining party" will again be subject to the objectionable supervision condition. Thus, the board argues, assuming that the meaning of ORS 14.175 is informed by the federal doctrine thus explicated, the imposition of SC 10 as a condition of petitioner's post-prison supervision is not "capable of repetition" in the sense required by ORS 14.175(2).

Petitioner accepts the board's broader point that, in enacting ORS 14.175, the legislature borrowed the "capable of repetition yet evading review" doctrine. But he argues that that does not resolve precisely which formulation of the doctrine that the legislature intended to adopt. In fact, petitioner observes, the words that the legislature chose in enacting ORS 14.175—the "best evidence" of what the legislature intended, *State v. Walker*, 356 Or 4, 13, 333 P3d 316 (2014)—are at odds with the judicial formulation of the doctrine that the board offers; therefore, he argues, the legislature did *not* intend to adhere to that formulation.

As an initial matter, this court's statements in *Couey* about the legislative history of ORS 14.175 do not support a singular focus on the federal formulation of the doctrine. To be sure, *Couey* described how the legislature "borrowed and codified a judicially created doctrine" and stated that, when the legislature borrows such a judicially created doctrine, "that case law is highly persuasive evidence of the legislature's intentions." 357 Or at 480. But the court in *Couey* then went on to discuss the adoption of the "capable of repetition" doctrine by *both* the federal and state courts—without alluding to any particular formulation of the doctrine. *Id.* at 480-82. Thus, there is no reason to assume from our decision in *Couey* that, in enacting ORS 14.175, the Oregon legislature intended to adopt or to apply a strict doctrine as set out in the federal cases on which the board relies.

Reviewing the text and context of ORS 14.175(2), we conclude that the meanings of words and phrases in that subsection are not controlled by the board's cited federal cases. Our conclusion is driven by context, specifically (1) the existence of doctrinal variations concerning the meaning and application of the "capable of repetition" concept when the legislature enacted the statute and (2) other wording in ORS 14.175.

First, the formulation of the doctrine set out in the cases that the board cites is not—and was not at the time the legislature enacted ORS 14.175—universally accepted or applied by state courts. Some state courts have defined the "capable of repetition" aspect of the doctrine in a different and less restrictive way. Some state courts do not require a showing that the same party will be subjected to the challenged action in the future. *See, e.g.*, *Byrd v. Irmo High School*, 321 SC 426, 431-32, 468 SE 2d 861 (1996) (dispensing with the requirement that there be a reasonable expectation that the "same complaining party" would be subject to the challenged action again); *Loisel v. Rowe*, 233 Conn 370, 382-83, 660 A2d 323 (1995) (doctrine applies when challenged action is of short duration, there is likelihood that issue will arise again and will affect "either the same complaining party *or a reasonably identifiable group*

*for whom that party can be said to act as surrogate*," and the issue has "public importance"). Other state courts have adopted less stringent "capable of repetition" requirements when an action by a government body is challenged. *See, e.g.*, *Okada Trucking Co. v. Board of Water Supply*, 99 Hawaii 191, 197, 53 P3d 799 (2002) (court would not dismiss "where a challenged governmental action would evade full review because the passage of time would prevent any single plaintiff from remaining subject to the restriction complained of for the period necessary to complete the lawsuit").

And even the federal courts do not adhere in every case to all the particulars of the doctrine as articulated in the cases cited by the board. More than one commentator has observed that the United States Supreme Court sometimes ignores the "same complaining party" element of the federal formulation and focuses on the fact that other similarly situated persons will continue to be affected by the challenged conduct. *See, e.g.*, *Honig*, 484 US at 335-36 (Scalia, J., dissenting) (suggesting that tendency to omit "same complaining party" element was limited to cases involving abortion and election deadlines); Matthew I. Hall, *The Partially Prudential Doctrine of Mootness*, 77 Geo Wash L Rev 562, 590-93 (2009) (noting that federal courts have regularly omitted "same complaining party" element in abortion, election, residency requirement, and other cases).

Second, bearing in mind the doctrinal variation that existed when the legislature "borrowed and codified a judicially created doctrine," *Couey*, 357 Or at 480, we note that, in two respects, the text of the statute departs from the formulation of the doctrine concerning moot cases that the board recites. As discussed, the federal doctrine on which the board relies contains two elements that must combine to avoid the general rule that moot cases should be dismissed: "(1) the challenged action [must be] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [must be] a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy*, 455 US at 482; *Wisconsin Right to Life*, 551 US at 463. The federal rule thus stated applies to any sort of action that becomes moot. But ORS 14.175 is limited to

challenges to an "act, policy or practice of a public body." That limitation does not appear directionless. That category of actions is congruent with the historical category of actions in Oregon known as "public actions," which courts historically could consider without regard to whether the person bringing the action had a personal stake in the outcome. *Couey*, 357 Or at 516; *see also id.* at 508-10, 521-22 (discussing this court's historically recognized authority to decide "public actions" and cases "involving matters of public interest"—regardless of the plaintiff's personal stake). A "public action" encompasses proceedings that challenge "the lawfulness of an action, policy, or practice of a public body, and such matters are precisely those to which ORS 14.175 applies." *Id.* at 522. In addition, the federal rule applies only to actions of short duration (or, at least, to those that are too short in duration to be fully litigated before their expiration). But ORS 14.175 by its terms contemplates that some challenged conduct ("similar acts" or the "policy or practice") will be ongoing ("continues in effect"), even if the application of the ongoing conduct to the challenging party is not.

Those stark differences between ORS 14.175 and the federal common law doctrine of "capable of repetition yet evading review," as articulated and developed in *Murphy*, *Wisconsin Right to Life*, and other cases cited by the board, undermine the argument that the legislature intended to strictly enact the federal doctrine as articulated by the board. Although those cases may be persuasive evidence of the legislature's intention regarding the general underpinning of ORS 14.175 (as we suggested in *Couey*), they are significantly less persuasive when it comes to the meaning and scope of words and phrases in ORS 14.175 that are not part of the federal formulation noted by the board. What that ultimately means is that we decide what the legislature intended by "an act challenged by the party" being "capable of repetition," for purposes of ORS 14.175(2), in accordance with our usual interpretive paradigm, without following in lockstep the federal cases analyzing and applying the federal doctrine that the board cites.

Under our interpretive paradigm, the words that the legislature used in the enactment are the best evidence

of the legislature's intention. Here, the phrase "capable of repetition" in ORS 14.175(2) is a term of art that hearkens back to the numerous federal and state cases, starting with *Southern Pacific Terminal Co. v. Interstate Commerce Comm.*, 219 US 498, 31 S Ct 279, 55 L Ed 310 (1911), that use the same phrase to describe an exception to the usual rule that moot cases should be dismissed.

Although, as we have discussed, those cases do not unanimously describe the doctrine, they share a common feature: At the very least, the party seeking relief must establish that it is reasonable to believe that the person or entity whose act is being challenged will repeat the act or continue it in a way that will similarly affect someone. *See, e.g.*, *Southern Pacific Terminal*, 219 US at 515 ("The question involved in the orders of the Interstate Commerce Commission are usually continuing * * *, and these considerations ought not to be, as they might be, defeated by short term orders, capable of repetition, yet evading review, and *at one time the government, and at another time the carriers*, have their rights determined by the commission without a chance of redress." (Emphasis added.)). That broad idea—that there is a reasonable potential that the act will recur to a similar effect—seems to be what the legislature intended to convey by the phrase an "act" that is "capable of repetition."

Other parts of ORS 14.175 provide context and suggest that the legislature did not intend the requirement that the "act" be "capable of repetition" to be so strict that it would demand a showing of the potential for a recurrence to the same party and in identical circumstances. First, insofar as ORS 14.175(2) provides the same exception when a person's challenge to a "policy or practice [that] continues in effect" becomes moot, the focus appears to be on the continuing conduct of the public body, rather than the identity of the person affected. As noted, the statutory focus on actions, policies, or practices of a public body is consistent with this court's historic case law permitting adjudication of "public action" cases that are moot. Additionally, the fact that ORS 14.175(3) refers to "the challenged policy, practice or *similar* acts" evading review suggests that the legislature understood

that variation in the particulars of the public body's act as it might recur should not stand in the way of review.

Legislative history confirms that understanding. During one of the public hearings on House Bill 2324 (2007), which created ORS 14.175, an attorney involved in constitutional cases expressed support for the bill and explained that the bill would provide courts with authority to decide cases such as those involving student journalists or issues related to elections. Audio Recording, House Committee on Judiciary, HB 2324, Apr 19, 2007, at 1:04:06 (statement of Charles Hinkle), http://records.sos.state.or.us/ORSOSWebDrawer/Record/4211424# (accessed Oct 17, 2019). Special Counsel to the Attorney General, Philip Schradle, appearing on behalf of the Department of Justice, followed. He suggested that the committee make changes to the bill, including, among other things, adding a requirement that the challenged act and resulting injury to the party be "capable of repetition *as to that party*." *Id.* at 1:20:10 (statement of Philip Schradle). He explained that the statutory requirement then would hew more closely to the federal requirements for hearing moot cases. *Id.* at 1:23:00.

But Representative Gregory Macpherson, who was the bill's carrier, responded that the suggested change would "significantly blunt the effect that we're trying to get here." He explained that the reason that the bill had come up in the first place was to protect the constitutional rights of student journalists; thus, it would need to apply to students who had graduated and who would not themselves suffer the problem again. *Id.* at 1:22:25 (statement of Gregory Macpherson).

The exchange between Schradle and Representative Macpherson was followed by additional remarks from a representative from the American Civil Liberties Union of Oregon, Hinkle, and Representative Bonamici about why a requirement of repeated injury to the "same party" would foreclose decisions on important cases and would be a bad idea. *Id.* at 1:25:10 (statements of Andrea Meyer, Charles Hinkle, and Suzanne Bonamici). Hinkle further noted that even the United States Supreme Court had not consistently applied the "same party" requirement that the Department of Justice was proposing. *Id.* at 1:28:14. The phrase proposed

by the Department of Justice and opposed by others at the hearing—"as to that party"—was not added to the bill. Thus, it appears from the legislative history that the legislature made a deliberate decision to reject the federal "capable of repetition" doctrine that the state advances in this case and to permit courts to decide cases in which there was no chance that the particular party would be affected again.

We conclude that ORS 14.175(2) requires that the act of the public body that no longer is affecting the plaintiff or complaining party be reasonably susceptible to repetition as to someone. Nothing in the case law that has interpreted or applied ORS 14.175 is to the contrary. And though there are statements to the contrary in cases discussing the common law "capable of repetition" doctrine as it has developed in the federal courts, for the reasons set out above, we conclude that those cases are not controlling, or even particularly persuasive, with respect to the meaning of words and phrases in ORS 14.175(2).

Applying ORS 14.175(2) in this case, the challenged act—the board's imposition of a condition of post-prison supervision requiring a supervised person to obtain his or her supervising officer's written permission before entering into an "intimate" relationship or encounter—is reasonably susceptible to repetition. The board acknowledges that it has imposed SC 10 in "other cases involving domestic violence conditions." And evidence submitted by petitioner shows that, at a 2012 meeting, the board discussed a "Special Condition 10," with wording that is identical to SC 10 at issue here, "for domestic violence convictions, assaults or any other case where they feel it is necessary for public safety." Whether or not that is evidence of a "policy" of the board, within the meaning of ORS 14.175(2), it shows that the board has agreed that the condition may be applied when a supervised person has been convicted of a certain category of common crimes. That agreement suggests a significant potential that the board's "act" of imposing SC 10 as a condition of post-prison supervision will be repeated.

2. *"Likely to evade judicial review"*

The board also argues that the present circumstances do not satisfy the requirement set out in ORS 14.175(3) that

the challenged act or similar acts will be "likely to evade judicial review in the future." The board begins by observing that an act of a public body generally will "evade review" because it is too short in duration to be fully litigated before it ceases or expires. It then points to two appellate cases in which a supervised person's challenge to the board's authority to impose a special condition of supervision was fully litigated before the person was discharged from supervision (and the challenged condition) as evidence that challenges of that nature can be fully litigated while the person is subject to supervision. *See Martin v. Board of Parole*, 327 Or 147, 957 P2d 1210 (1998); *Ferry v. Board of Parole*, 293 Or App 216, 427 P3d 1123 (2018). But, as this court noted in *Couey*, the fact that there are a few reported cases in which a party in similar circumstances was able to complete the litigation before the challenged act ceased or expired is insufficient to establish that the act is not likely to evade review. 357 Or at 483.

As the board acknowledges, other reported cases concerning a petitioner's special condition of post-prison supervision have been rendered moot when the petitioner completed his or her term of supervision before a judicial decision was rendered. *See, e.g.*, *State v. Fries*, 212 Or App 220, 230, 158 P3d 10 (2007), *aff'd*, 344 Or 541, 185 P3d 453 (2008). Given that terms of post-prison supervision generally range from one to three years, *see generally Oregon Felony Sentencing Guidelines Grid*, OAR ch 213, App 1, and an appeal of a board's imposition of a special condition of post-prison supervision has never been litigated through a decision by this court in less than three years,[5] we conclude that the board's imposition of such conditions is "likely to evade review" if the ordinary rule directing dismissal of moot cases applies.[6]

---

[5] *Martin*, 327 Or 147 (over three years from order of supervision to decision by this court); *Weems/Roberts v. Board of Parole*, 347 Or 586, 227 P3d 671 (2010) (over five years from orders of supervision to decision by this court).

[6] Similarly, we do not view the companion case to *Penn* pending before this court and decided today, *Tuckenberry v. Board of Parole*, 365 Or 640, 451 P3d 227 (2019), as precluding a determination that a case involving a party under supervision who challenges post-prison supervision conditions established by the board usually will become moot before a decision of this court can be issued. *Tuckenberry* involves a challenge by a petitioner with a post-prison supervision term that is longer than most (three years and nine months), and our decision

We accordingly conclude that petitioner's challenge to the board's imposition of SC 10 as a condition of his post-prison supervision meets all the requirements set out in ORS 14.175. Therefore, it "may" be reviewed by this court despite its mootness, should the court exercise the discretion that ORS 14.175 extends. *See Couey*, 357 Or at 522 (ORS 14.157 does not require court to review otherwise moot case that satisfies statutory requirements; court determines "whether it is appropriate [to do so] under the circumstances of each case").

B.   *Exercise of Discretion*

Although the board suggests that the issues in this case are not ones that merit an exercise of the court's discretion under ORS 14.175 because they arise in the context of "a specific exercise of the board's discretion to impose special conditions in light of the specific factual circumstances presented by petitioner's criminal hitory," we are persuaded that a decision will have broader relevance. Petitioner raises a serious challenge to the statutory authority of the board and the constitutionality of the board's imposition of SC 10. Additionally, the issues have great importance to many people, including many present and future supervised persons and persons who wish to have or continue intimate relations with them. We conclude that this case is a proper one for an exercise of discretion. Although a decision on the merits no longer will have any practical effect on petitioner himself, the court nevertheless will decide the case on its merits.

## III.   THE MERITS

As discussed, petitioner challenges the board's imposition of SC 10 as a condition of his post-prison supervision on two grounds: (1) the board lacked statutory authority to impose the condition and (2) the condition is unconstitutionally vague and overbroad. We begin and end with the first ground, concluding that the board exceeded its authority in imposing SC 10.

---

issues over three years after the board imposed the challenged condition in that case.

The board's authority to impose conditions of post-prison supervision on a person who will be under its supervisory authority is set out in ORS 144.102. Certain general conditions that "may" be imposed on any such person are set out in subsection (2), and conditions that "shall" be imposed on groups of supervised persons required to report as sex offenders or convicted of certain crimes are set out, respectively, in subsection (3) and paragraphs (4)(b), (c), and (d). Paragraph (4)(a), the relevant provision in this case, provides the board with authority to impose "special" conditions based on the supervised person's individual circumstances:

> "The board *** may establish special conditions that the board *** *considers necessary* because of the individual circumstances of the person on post-prison supervision."

(Emphasis added.)

While acknowledging that paragraph (4)(a) invests the board with authority to impose special conditions, petitioner notes that the board's authority is limited by the requirement that the conditions be ones that the board "considers necessary" because of the supervised person's individual circumstances. What is more, petitioner adds, the "necessity" that limits the board's authority must be determined by reference to two goals—the promotion of public safety and assisting in the reformation of the supervised person—that are identified in another post-prison supervision statute, ORS 144.096(3).[7] *See Weems/Roberts v. Board of Parole*, 347 Or 586, 598, 227 P3d 671 (2010) (board may approve special conditions "based on what may be necessary 'to promote public safety' and 'to assist the reformation of the inmate'"); *Martin*, 327 Or at 159 (for purposes of ORS

---

[7] ORS 144.096(3) provides that a post-prison release plan, prepared by the Department of Corrections in consultation with the board and ultimately approved by the board, must include:

"(b) The recommended conditions of post-prison supervision;

"*****

"(d) *Any other conditions and requirements as may be necessary to promote public safety*;

"*****

"(f) *Any conditions necessary to assist the reformation of the inmate.*"

(Emphases added.)

144.102(4)(a), "the 'necessity' of special conditions must be determined in reference to the statutory objectives * * *, namely, the protection of public safety and the reformation of the offender").

Thus far, petitioner's explanation of the board's authority under ORS 144.102(4)(a) to impose special conditions does not differ substantially from the explanations in this court's own cases. However, petitioner argues that the term "necessary" has additional significance, not evident in those cases: He contends that, by using the term, the legislature limited the board's authority to impose only those conditions that the board reasonably could consider "logically necessary, essential, or indispensable" to the goals of reforming the offender and protecting public safety.

As a result, petitioner argues, the board erred in two respects when it refused to remove SC 10 from his order of post-prison supervision. First, he argues that the board misinterpreted the term "necessary" to mean something akin to having any "logical nexus" between a special condition and the statutorily recognized goals of reformation and public safety, rather than logical necessity. He points out that, in its final order rejecting petitioner's challenge to SC 10, the board stated only that the condition was "in the interest" of the statutory goals of public safety and offender reformation. He concludes that the board went beyond the bounds of its authority to impose special conditions under ORS 144.102(4)(a).

Second, petitioner argues that the board could not reasonably have considered SC 10 indispensable or essential to the statute's public safety and reformation goals. Petitioner suggests that the term "necessary" requires a special condition to be narrowly tailored or proportional to the specific risk that it seeks to address. In regard to the risk that he supposedly presents, petitioner assumes that the board concluded that petitioner might commit acts similar to those that resulted in his convictions in the context of some future intimate relationships or encounters. But, in his view, completely regulating all his "intimate" affairs, as SC 10 does, goes beyond what would be adequate to mitigate that risk.

        Both of petitioner's arguments ultimately assume that the term "necessary" in ORS 144.102(4)(a) has the meaning that he assigns to it—logically required, essential, or indispensable—but which the board disputes. The parties also are at odds over a precursory issue: this court's authority to determine the term's meaning. While petitioner asserts that, in this context, "necessary" is an inexact statutory term, the meaning of which is a determination for the courts, the board contends that, when read in the context of the phrase "the board *** considers necessary," the term reflects a delegation of policymaking authority to the board, leaving the courts with only one task: to determine whether the board's actions fall within the general scope of the legislature's delegation.

## A.    *Inexact or Delegative Terms*

        In arguing over the nature of this court's review of the board's order, the parties allude to the framework, first announced in *Springfield Education Assn. v. Springfield School Dist. No. 19*, 290 Or 217, 621 P2d 547 (1980), for determining the role that a court plays in reviewing an administrative agency's actions under a statute that the agency is required to administer. In *Springfield*, this court identified three categories of terms that might appear in such statutes, each of which requires a different approach to the agency's understanding and application of the statute. Two are at issue in this case. "Inexact" terms embody a complete expression of the legislature's intentions, but those intentions are not evident, and it is for the courts to interpret them and the legislative policy they convey, and then to decide whether the agency action conforms to that policy. *Id.* at 224-28. "Delegative" terms "express non-completed legislation which the agency is given delegated authority to complete." *Id.* at 228-29. The only role of appellate courts with respect to such delegative terms is to ensure that the agency exercises the authority delegated to it "within the range of discretion allowed by the more general policy of the statute." *Id.* at 229.[8]

---

[8] The third category, "exact" terms, are terms that unambiguously convey a complete policy choice by the legislature. They require no interpretation, and courts will only review the agency's *application* of the statute to determine

Petitioner contends that the term "necessary" in ORS 144.102(4)(a) is inexact and was intended by the legislature as a limitation on the kind of special condition that the board may impose. The board contends that the term is delegative. According to the board, by authorizing it to impose special conditions that it "considers necessary," the legislature was delegating to the board the task of determining how best to use special conditions to further public safety and offender reformation. In light of that delegation, the board argues, this court must defer to the standard that the board has chosen to apply in choosing special conditions, which is that such conditions need only be rationally related to the noted objectives.

The question whether the term "necessary" is inexact or delegative in this context is one of legislative intent, and we address it as we would any other question of statutory construction. *OR-OSHA v. CBI Services Inc.*, 356 Or 577, 588, 341 P3d 701 (2014). In *OR-OSHA*, we identified a number of considerations that are helpful in determining whether a given statutory term expresses an incomplete legislative meaning and, thus, is delegative, including (1) whether the court has concluded that the term, or one like it, is delegative in another context; (2) whether the term is defined by statute or, on the other hand, susceptible to many different interpretations; (3) whether the term is one that invites a value or policy judgment; and (4) whether other, related provisions suggest a legislative intent that the term be considered a delegation. *Id.* at 590.

With respect to the first consideration, both parties identify cases in which this court has placed the term "necessary" in the category they believe to be the correct one. The board points to *Diack v. City of Portland*, 306 Or 287, 299, 759 P2d 1070 (1988), in which this court concluded that the statutory requirement, applicable to the Water Resources Commission, that the free-flowing character of certain waters "be maintained in sufficient quantities necessary for recreation, fish and wildlife uses" delegated to the commission the authority to determine the level of stream

---

whether it is within the unambiguously stated policy. *Springfield*, 290 Or at 223-24. Neither party contends that the term at issue here is an exact term.

flow needed for those purposes, "which may themselves differ from time to time." Petitioner relies on *J.R. Simplot Co. v. Dept. of Agriculture*, 340 Or 188, 197-98, 131 P3d 162 (2006), in which this court rejected the Department of Agriculture's claim that a provision that directed it to collect fees for its product inspection services that are "reasonably necessary to cover the cost of inspection and [program] administration" delegated policymaking authority to the board and held, instead, that the phrase was an "inexact" term that expressed a complete legislative policy.

The differing outcomes in *Diack* and *Simplot* suggest that it is important to look, not just at whether a word has been deemed in other cases to be inexact or delegative in other contexts, but at the underlying analysis. If we apply that suggestion to *Diack*, all we can say is that the case is relatively devoid of explanation as to why the "necessary for *** uses" phrase was deemed delegative. *See Diack*, 306 Or at 299. *Simplot*, on the other hand, persuasively explains why "reasonably necessary to cover [costs]" expresses an inexact but complete policy choice. Specifically, the court in *Simplot* explained that the statute at issue set out a complete policy objective (that the agency's inspection program be self-funding) and used the phrase "reasonably *necessary* to cover [costs]" to specify the relationship that must exist between that complete legislative policy and the vehicle identified by the legislature for pursuing the policy, *i.e.*, fees. 340 Or at 197-98.

That explanation from *Simplot* seems to be relevant to the context in which "necessary" is used in ORS 144.102(4)(a), namely, the phrase "the board *** considers necessary." As noted above, 365 Or at 625-26, ORS 144.102(4)(a) has been deemed to convey two goals of post-prison supervision to be achieved by the imposition of special conditions of supervision. The term "necessary" describes the required relationship between the goals (which themselves represent a complete legislative policy) and the conditions of supervision that are the vehicles for pursuing those goals. At least under the analytical construct used in *Simplot*, the phrase "considers necessary because of the individual circumstances of the person on post-prison supervision" is part of a more or less defined instruction as to how the board is to carry out the

complete policy choice expressed in the goals that are asso-
ciated with ORS 144.102(4)(a)—not a general delegation of
authority to the board to refine and complete an incomplete
policy.

Turning to the second consideration enumerated in
*OR-OHSA*, regarding the specificity of the term's defini-
tion, we note that the term "necessary" is not defined for
purposes of ORS 144.102(4)(a). And though the term may
be "susceptible" to many interpretations depending on the
circumstances, as the board suggests, it is not a term that *in
itself* has a broad range of meanings in ordinary parlance.[9]

As to the third consideration set out in *OR-OSHA*,
the word "necessary" does not call for a value judgment or
policy judgment in this context. The only policy judgment
that is relevant has already been made—completely—by the
legislature, as expressed in the goals of promoting public
safety and assisting in reformation and in the identification
of special conditions as a vehicle for achieving those goals.
And though the board contends that the word "considers"
turns the phrase "considers necessary" into one calling for
a value judgment, we are not persuaded: ORS 144.102(4)(a)
does *not* ask for the board's considered opinion as to whether
a condition is fair, reasonable, or desirable—the kind of con-
siderations that would involve value judgments, *OR-OSHA*,
356 Or at 590—but instead whether it is "necessary" for
specific objectives.

Finally, with respect to the fourth consideration
from *OR-OSHA* (whether related provisions suggest that
the legislature intended a delegation), the board offers the
whole of ORS 144.102 as evidence of a legislative intent to
delegate authority to the board to devise any special condi-
tion it believed would be helpful. Boiled down to its essence,
the board's argument is that, given the list of specific con-
ditions that may or shall be imposed, subsection (4)(a) must
be understood as a "backstop in the statutory framework to
ensure that the board may impose conditions [that account]
for a particular offender's circumstances." Yet it does not
follow that the legislature placed no limitations on that

[9] See below, 365 Or at 632 (definition of "necessary").

"backstop" authority. Instead, there are recognized statutory objectives for which, in the board's consideration, a condition must be necessary. We see nothing in the other paragraphs of ORS 144.102, or any other related provision, that indicates a legislative intent that ORS 144.102(4)(a) be understood as a delegation of policy-making authority.

Based on our examination of the four considerations identified in *OR-OSHA*, we conclude that, in the context of ORS 144.102(4)(a), the word "necessary" is not a delegative term that grants authority to the board to complete an incomplete legislative policy. Rather, it is an inexact term, the intended meaning of which is for this court to determine.

B.  *What the Legislature Intended by the Phrase "considers necessary"*

The board argues that the term "necessary," even if it is an inexact rather than a delegative term, still has a broad range of meanings and, in the phrase "considers necessary," simply means "useful" or "convenient." Thus, the board contends that any condition that it considers useful to, or as having a rational nexus to, the statutory objectives of public safety and reformation of criminal offenders is permissible. Petitioner maintains that ORS 144.102(4)(a) authorizes only special conditions that, in light of the supervised person's individual circumstances, a reasonable board would consider indispensable or essential to the statutory objectives. In his view, that means that any restriction in a special condition must be proportionate to the specific risk of harm that the offender purportedly poses. Although we agree with petitioner that the board proffers an understanding of the statute that is contrary to the ordinary meaning of the term "necessary," we also reject petitioner's construction of the statute.

The term "necessary" is undefined in the statute, and there is no reason to think that the legislature had anything other than the ordinary meaning of that word in mind. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993) (in construing a statute, court assumes that the legislature generally uses words in their "plain, natural, and ordinary" senses). The definition of "necessary"

that appears in *Webster's Third New Int'l Dictionary* 1510 (unabridged ed 2002)[10] does not comport with the board's interpretation, because all the senses of "necessary" that appear in the definition convey some sense of requirement or obligation. Despite the variation in the ordinary meaning of the word, the possibilities do not extend to a point where "necessary" can mean merely "useful" or "having a rational nexus to."

The board's suggestion to the contrary is based on the definition of "necessary" in *Black's Law Dictionary* 1029 (6th ed 1990):

> "The word [(necessary)] must be considered in the connection in which it is used, as it is a word susceptible to various meanings. It may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought."

That definition quotes a passage from an early Oklahoma case, *Kay County Excise Board v. Atchison*, 185 Ok 327, 91 P2d 1087 (1939), and relies on the importance of context rather than what "necessary," by itself, means in ordinary parlance. If the board hopes to show that the term, as used in the statute, is so stripped of its ordinary meaning that "having a rational nexus to" is an adequate substitute, then it must identify specific contextual cues that point in that direction.

In that respect, the board makes three context-based arguments. First, the board returns to its previous argument that, considering the context of ORS 144.102 as a whole, paragraph (4)(a) functions as a backstop to allow the board to account for an individual offender's circumstances

---

[10] *Webster's Third New Int'l Dictionary* 1510 (unabridged ed 2002) defines "necessary" as follows:

> "**1 a :** that must be by reason of the nature of things : that cannot be otherwise by reason of inherent qualities : that is or exists or comes to be by reason of the nature of being and that cannot be or exist or come to be in any other way : that is determined and fixed and inevitable *** **b :** of, relating to, or having the character of something that is logically required or logically inevitable or that cannot be denied without involving contradiction *** **2 :** that cannot be done without : that must be done or had : absolutely required : ESSENTIAL, INDISPENSABLE."

and must be read to give the board the broadest possible discretion. However, as we already have stated, there is no necessary incompatibility between the board's authority to impose special conditions, "backstop" or not, and limiting the board to special conditions that have something more than a rational nexus to the goals that the statute references.

Second, the board notes that the statute looks to whether the board "considers" the special condition to be "necessary." In its view, the fact that the board considers whether conditions are necessary implies a mere "rational nexus" review.

And third, the board relies on two of this court's cases to support its construction of ORS 144.102(4)(a). From *Weems/Roberts*, the board quotes the court's explanation, in upholding the board's imposition of certain special conditions, that the conditions were "a logical way for the board to further the safety of the public, as well as the offender's reformation and 'reintegration into the community.'" 347 Or at 600. And in *Martin*, the board observes, this court 's explanation for upholding the special condition at issue (a bar on entering a large portion of the state where there was a chance, albeit a low one, that the offender might encounter his victim) seemed to look at whether the condition was a reasonable response to the risk of an accidental meeting, which appeared to be the board's primary concern. 327 Or at 159-60.

We agree with the board that the word "considers" plays an important role in understanding what the legislature intended through ORS 144.102(4)(a). The statute authorizes conditions that "the board * * * *considers* necessary." As relevant to the present usage, "consider" means "to think of : come to view, judge, or classify." *Webster's* at 483. Thus, using the ordinary meanings of "necessary" and "considers," a court would not review whether the condition *in fact* is logically required or essential to promote one or both of the statutory objectives ("to promote public safety" and "to assist the reformation of the inmate," ORS 144.096 (3)(d), (f)); rather, ORS 144.102(4)(a) is premised on the board *viewing* the condition that way. The board does not contend that we should review SC 10 solely for whether the board in

fact applied the standard and considered the condition to be necessary, nor do we consider the statute to imply such a minimal standard of review. That presents the question of the extent to which the legislature intended a reviewing court to defer to the board's view.

For several reasons, we decline to read the statute as the board does, that is, as a grant of discretion to impose special conditions that is so broad that it calls for a court to review an imposed condition for what amounts to review for any rational basis. First, the legislature did not expressly describe the board's authority as a broad grant of discretion, as it did in ORS 144.101(3) (providing that, upon request of person who challenges a local supervisory authority's imposition of conditions of supervision or sanctions for violating those conditions, the board "shall review the request and may, at its discretion, review the conditions and sanctions, under rules adopted by the board"). Second, the legislature used "necessary"—not "advisable," "useful," "helpful," "suitable," or similar imprecise standards suggesting a broader range of choices—for the board's imposition of a special condition. Considering the ordinary meanings of the word "necessary"—such as "logically required," "essential," and "indispensable," we doubt that the legislature intended a court to review the imposition of a condition for a rational nexus or basis. Instead, the plain meaning of the text suggests that a court should review whether the board met the statutory standard in imposing a special condition by considering whether the board did and *reasonably could* view it as essential to promote public safety or assist in offender reformation.

At the same time, we reject the stringent, identified-risk standard that petitioner advocates. First, petitioner's proposed standard implies that the board must make specific findings and must expressly state the risk of harm to be addressed by the condition in its order, but this court in *Martin* rejected that position, which the supervised person also had argued. *See* 327 Or at 158-60. Second, petitioner's proposed standard appears to limit the scope of considerations that the board can take into account, reducing the board's discretion to a single, narrow target: the mitigation

of a specific risk of harm that the board identifies. But the board can and must consider advancing one or both of the dual goals of public safety *and* offender reformation in the light of the supervised person's specific circumstances, including the supervised person's current and prior convictions, history and background, record of conduct, and the risk of future harm that that conduct suggests. *See Weems/Roberts*, 347 Or at 595 (noting that individual circumstances "focuses, specifically, on the offender, not the offense"); *id.* at 596-98 (discussing information the board may consider before imposing special conditions).

We conclude that ORS 144.102(4)(a) authorizes the board to impose any condition that, in light of the supervised person's individual circumstances, the board reasonably could view as essential to or required for one or both of its broad objectives of "promoting" public safety and "assisting" in an offender's reformation. The standard that we adopt both follows closely from the text of ORS 144.102(4)(a) and the objectives stated in ORS 144.096(3)(d) and (f) and is consistent with the outcomes in the *Weems/Roberts* and *Martin* cases. As noted, the board may consider and impose special conditions that promote or assist the statutory objectives, which is different from accomplishing the objectives. This court in *Weems/Roberts* alluded to that point, emphasizing the words "to promote" and "to assist" in the description of the statutory objectives when it rejected a petitioner's proposal that special conditions must be tailored to address only "certain or immediate risks to public safety or offender reformation," as reflected in evidence of "recent, significant conduct." 347 Or at 598. And this court concluded in *Martin* that, once the board had "weighed the different interests of the parties," the board could impose special conditions of post-prison supervision to address any substantial danger with regard to promoting public safety and assisting the supervised person's reformation. *See Martin*, 327 Or at 159-60 (explaining that the board had expressly weighed interests of parties and was not required to impose conditions so narrowly that "they would permit a substantial danger" that the supervised person would encounter the victim, which "would be a psychological disaster" for the victim). That conclusion in *Martin*, which permits the board to address

substantial dangers with respect to either of the dual statutory objectives, is consistent with our holding that permits the board to impose special conditions when it reasonably concludes that, in light of the supervised person's individual circumstances, the conditions are essential to or required to promote public safety or to assist in the offender's reformation. Thus, we reject the board's argument based on *Weems/Roberts* and *Martin*.

## C.  *Application to Petitioner's Statutory Challenge*

Having articulated the board's undertaking when it considers the imposition of special conditions under ORS 144.102(4)(a), we turn to petitioner's statutory challenge to the board's imposition of SC 10. In view of our holding, we consider whether the board did and reasonably could view imposition of SC 10—a condition that requires petitioner to obtain his supervising officer's permission before entering into any "intimate" relationship or encounter—to be essential in petitioner's case to advance or promote one or both of the goals of public safety and offender reformation.

The board contends that, in the context of SC 10, "intimate" means only "sexual" and, assuming that limited meaning, that the condition imposes a necessary restriction. With respect to the public safety objective, the board explains that, because petitioner had established a pattern, in the context of a sexual relationship, of using physical abuse and threats to force the other person in the relationship to perform sexual acts, it reasonably was concerned that petitioner would repeat the same behavior in another sexual relationship or encounter. By requiring petitioner to obtain permission from his supervising officer before entering into a sexual relationship or encounter, the board believed that the supervising officer could evaluate and monitor those contacts and ensure that petitioner was not harming other sexual partners. With respect to the objective of offender reformation, the board similarly points to the abusive pattern that petitioner had formed within the context of a sexual relationship and then explains that, by requiring petitioner to obtain his supervising officer's permission before entering into the sexual "environment" in which the impulse to act abusively might recur, the board

hoped to spark reflection in petitioner about such impulses as well as dialogue between petitioner and his supervising officer about his conduct that might guide him along a path toward reformation.

Though it might be reasonable for the board to consider a restriction on petitioner's *sexual* relationships and encounters as essential to advance the board's public safety and reformatory goals, the word "intimate" in SC 10 is not limited to that meaning. The central feature of SC 10 as written is the breadth of the restriction it places on petitioner. The ordinary meaning of "intimate" is broad—essentially, to be "marked by a very close physical, mental or social association, connection, or contact." *Webster's* at 1184. As that definition reflects, a relationship that is "intimate" could just as easily be describing a familial one, such as between a parent and child; a close friendship; or a sexual relationship.[11] In short, the category of human contact that SC 10 purports to regulate reasonably could be interpreted to include any ongoing or short-lived contact with a person with whom petitioner shares a close emotional, social, or physical connection.

Although petitioner raised the breadth of the phrase "intimate relationships or intimate encounters" in his initial administrative challenge to SC 10, the board declined to modify the phrase in response to that concern and only now maintains that it pertains exclusively to sexual relationships and encounters. In the absence of additional wording or context that establishes unambiguously that the

---

[11] The definition of "intimate" is further explicated with 10 different subsenses, four of which seem to pertain to relationships with other people:

"**e :** showing or fostering close personal interests and relations rather than those colder and more distant, formal, or routine **:** suggesting or furthering easy unreserved personal expression, feeling, or relationships through smallness, exclusiveness, limitation, or privacy * * *"

"**f :** marked by or appropriate to very close personal relationships **:** marked by or befitting a relationship of love, warm or ardent liking, deep friendship, or mutual cherishing <always ~ relations between a mother and her young child –Edward Westermarck> * * *"

"**g :** of, relating to, or befitting deeply personal (as emotional, familial, or sexual) matters or matters usu. kept private or discreet * * *"

"**h :** engaged in or marked by sexual relations **:** SEXUAL, MARITAL * * * [.]"

*Webster's* at 1184.

narrower meaning—"sexual"—is intended, a person of ordinary intelligence will not know, with any degree of certainty, whether the condition extends to close social and mental relationships and other close physical relationships as well as sexual ones.[12]

On review, the board has not argued that petitioner should be precluded in advance from living with or engaging in a close relationship with his children, other relatives, and friends, and it has not asserted that a broad condition, as we and petitioner read SC 10, legitimately advances the board's statutory goals. Indeed, we can think of no reason why requiring a supervising officer's permission before petitioner engages in all such contacts or relationships would be essential to advancing the board's goals of assisting in petitioner's reformation or promoting public safety.

Accordingly, we conclude that the board could not reasonably consider the imposition of SC 10 as a condition of petitioner's post-prison supervision to be essential to its broad objectives of public safety and offender reformation as they apply to petitioner's particular circumstances. It follows that, in imposing SC 10 on petitioner, the board acted beyond the statutory authority it has with respect to imposing special conditions of post-prison supervision.

## IV.   CONCLUSION

We conclude that, although the board enjoys significant authority under ORS 144.102(4)(a) to impose special conditions of post-prison supervision, it acted outside of that statutory authority by including SC 10 in its order of post-prison supervision with respect to petitioner. Thus, the board erred in denying petitioner's request for relief from SC 10, and the Court of Appeals erred in affirming that denial. In light of our holding, we do not reach petitioner's arguments that SC 10 is unconstitutionally overbroad and vague.

---

[12] We also note that the term is inherently subjective: Different individuals may have vastly different ideas of what would mark a relationship or encounter as "close" or "intimate." The result is that a supervised person who is subject to the condition could have little certainty as to whether a contemplated relationship or encounter is one that must be authorized in advance by the supervising officer, while a supervising officer charged with enforcing the condition could apply it arbitrarily or in a way that was not intended.

The decision of the Court of Appeals is reversed. The order of the Board of Parole and Post-Prison Supervision is reversed, and the case is remanded to the Board of Parole and Post-Prison Supervision for further proceedings.