364 October 5, 2023 No. 24

IN THE SUPREME COURT OF THE
STATE OF OREGON

In the Matter of B.Y.,
a Youth.

STATE OF OREGON,
*Petitioner on Review,*

*v.*

B.Y.,
*Respondent on Review.*

(CC 19JU00173) (CA A172581) (SC S069640)

On review from the Court of Appeals.*

Argued and submitted March 3, 2023, at Willamette University College of Law, Salem, Oregon.

Jonathan N. Schildt, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioner on review. Also on the brief were Ellen Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Christa Obold Eshleman, Youth, Rights & Justice, Portland, argued the cause and filed the brief for respondent on review.

Before Flynn, Chief Justice, and Duncan, Garrett, DeHoog, and Masih, Justices and Balmer and Baldwin, Senior Judges, Justices pro tempore.**

GARRETT, J.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed in part and reversed in part.

_____

* Appeal from Columbia County Circuit Court,Ted E. Grove, Judge.319 Or App 208, 510 P3d 247 (2022).

**Nelson, J., resigned February 25, 2023, and did not participate in the decision of this case. Bushong and James, JJ., did not participate in the consideration or decision of this case.

**GARRETT, J.**

The juvenile code provides a maximum amount of time that a youth can be committed to the custody of the Oregon Youth Authority (OYA) for each type of offense that, if committed by an adult, would constitute a crime. ORS 419C.501. However, the code does not explicitly address how multiple adjudications affect the calculation of that period. The issue in this case is whether, when a youth commits a new offense while already in OYA custody, the juvenile court's disposition can impose a new period of commitment to run consecutively to the period of commitment that the youth has not yet completed.

While on juvenile parole related to a commitment to OYA in an earlier case, youth was adjudicated to be within the jurisdiction of the juvenile court for interfering with a peace officer. Based on that conduct, the juvenile court imposed a new disposition, which also committed youth to OYA custody, to commence at the conclusion of youth's existing commitment. Youth challenged that order, contending that the juvenile court lacked authority to impose consecutive commitments. A divided panel of the Court of Appeals agreed with youth and reversed the order of the juvenile court. *State v. B.Y.*, 319 Or App 208, 510 P3d 247 (2022).

We allowed the state's petition for review to consider that question of statutory interpretation, and we now reverse the decision of the Court of Appeals in part and affirm in part.[1]

## I.   BACKGROUND

The facts, which are undisputed on review, are taken from the opinion of the Court of Appeals. In 2017, youth was committed to the custody of OYA for three and a half years. That commitment was the result of a combined disposition for multiple unlawful acts following a probation violation. Youth was placed in a youth correction facility for much of

---

[1] Youth raised a second assignment of error in the Court of Appeals, arguing that the juvenile court committed plain error in imposing a "one-year" commitment term when the statutory maximum was 364 days. The state agreed that that constituted plain error, and the Court of Appeals reversed the juvenile court on the length of the commitment term. We do not disturb that aspect of the decision of the Court of Appeals.

that time. He was paroled to a residential placement, but he ran away. When police attempted to apprehend him, he refused to comply with an order to stop and get on the ground. For that conduct, which at the time, if committed by an adult, would have constituted the Class A misdemeanor of interfering with a peace officer, *former* ORS 162.247(1)(b) (2018), *amended by* Or Laws 2021, ch 254, § 1, the state initiated a new delinquency proceeding. Youth admitted to the conduct. As part of its disposition in 2019, the juvenile court ordered that youth be committed to OYA for one additional year, to run consecutively to the existing commitment period, which was scheduled to end in November 2020. In other words, youth's cumulative period of commitment was extended from November 2020 to November 2021. Youth served that additional period, was then released, and his commitment to OYA was terminated in November 2021. The juvenile court terminated its jurisdiction over him.

Youth timely appealed while he was still in OYA custody, arguing that ORS 419C.501 does not allow a juvenile court to impose an additional commitment to run consecutively to an existing commitment.[2] A 1976 Court of Appeals case had held that juvenile courts possess the authority to impose consecutive commitment terms. *State ex rel Juv. Dept. v. T.*, 27 Or App 407, 556 P2d 146 (1976). The state argued below that, although *T.* interpreted a former version of ORS 419C.501 (ORS 419.511 (1971)), the subsequent amendments to the statute in 1999 had not disturbed the holding in *T.*

The Court of Appeals majority agreed with youth. Noting that the statutory text did not resolve the issue, the court relied on the context and history of the statutory scheme. *B.Y.*, 319 Or App at 218-19. The court first looked to its prior case from 1976, *T.*, 27 Or App at 409, which held that juvenile courts have the authority to impose consecutive commitments. It stated that *T.*'s holding had been based on the premise that, at the time, the juvenile code had expressly linked the maximum commitment term for a youth

---

[2] The underlying incident in this case, youth's interference with a peace officer, occurred in 2018. ORS 419C.501 was amended in 2019 and 2021. However, those were not substantive amendments, and they do not affect our analysis. Therefore, all references to ORS 419C.501 in this opinion are to the current version of the statute unless stated otherwise.

to the maximum sentence that an adult could serve for the same conduct. The court then reasoned that, because criminal courts in 1976 had broad statutory authority to impose consecutive sentences for adult offenders, it had logically followed in *T.* that juvenile courts had similar authority.

However, as the court explained, the legislature amended the juvenile statute in 1999 and severed that "linkage" between a juvenile court's authority and a criminal court's sentencing authority in adult cases. In addition, the court explained that intervening changes to the criminal sentencing statutes, following the *T.* decision and prior to the 1999 amendments, had limited the authority of adult criminal courts to impose consecutive sentences. As a result, the majority reasoned, the premise for the court's conclusion in *T.* no longer existed. The majority ultimately determined that, because of the conflict between the *T.* decision and the 1999 amendments, the legislature's intent on the question was "ambiguous." The court concluded that, had the legislature considered the question, it would not have intended to grant unlimited authority to juvenile courts to impose consecutive commitment terms in juvenile delinquency cases.

In dissent, Chief Judge Lagesen reasoned that the statutory scheme gives the juvenile court broad discretion to determine the conditions and duration of an OYA commitment and provides factors for the court to consider, including other conduct by the youth. The dissent noted that the 1999 amendments did not address the consecutive-commitment question. The dissent also explained that "juvenile courts long have been understood to have [the] authority" to impose consecutive commitment terms, and concluded that, "[a]bsent a clear indication from the legislature that it intended to displace that status quo," the court should maintain it. *Id.* at 222 (Lagesen, C.J., dissenting) (citing *T.*, 27 Or App at 407).

The state petitioned for review, which we allowed.

## II.   ANALYSIS

Before addressing the interpretive question in this case, we provide a brief description of juvenile delinquency proceedings. When a youth engages in conduct that would constitute a crime if committed by an adult, the state may

petition the juvenile court to find the youth within its jurisdiction. ORS 419C.005 (providing juvenile courts with exclusive original jurisdiction of delinquency proceedings); ORS 419C.250 (providing process for filing delinquency petitions).

The court then holds a hearing, which constitutes the "adjudication" phase. ORS 419C.001 (listing the three phases of the juvenile justice system as "initiation, adjudication and disposition"). During the adjudication phase, the state must prove the facts alleged in the petition beyond a reasonable doubt. ORS 419C.400. If the juvenile court finds that the youth did engage in the conduct alleged, it finds the youth within its jurisdiction and enters a disposition order. ORS 419C.411. The disposition order sets forth the requirements and conditions that the youth must complete as part of youth's rehabilitation. *See* ORS 419C.440 - 419C.510 (setting out the types of dispositions and under what circumstances a court may impose them). The disposition also includes any changes in youth's custody—guardianship, parental custody, or OYA custody—when the court determines that a change in custody is appropriate. *See* ORS 419C.446 (stating that the court may "direct" that the adjudicated youth remain in parental custody or the court may place a youth in the custody of a relative, foster home, or child care center); ORS 419C.478 (stating that the court has authority to place an adjudicated youth in the legal custody of OYA or the Department of Human Services).

The terminology used in the juvenile code is unique to this context. Therefore, we clarify a few terms before addressing the question in this case. "Commitment to OYA" and "OYA custody," as the state explained at oral argument, are used interchangeably throughout the juvenile code and are distinguished from the physical location where a youth is "placed." *See, e.g.*, ORS 419C.478 (permitting juvenile courts to commit adjudicated youths to OYA and place them in "custody" of OYA for care, placement, and supervision); ORS 419C.486 (requiring OYA to take recommendations from the "committing court" to facilitate planning for "adjudicated youths committed to its custody"); ORS 419C.492 (allowing juvenile courts to review placements made by OYA or the Department of Human Services and direct OYA or

the department to "place" the youth in a type of "residential placement" if the youth's rights are being violated). The "disposition" is the judgment of the juvenile court that imposes conditions on the adjudicated youth for the purpose of that youth's rehabilitation. ORS 419C.411. The disposition, like the one in this case, may include a commitment to OYA custody. ORS 419C.478. When a juvenile court imposes a disposition, it must "fix the duration" of the disposition and, when the court's disposition includes a commitment to OYA custody, the commitment must be for an indefinite period. ORS 419C.501. The statute then limits that indefinite period for specific types of offenses. *Id.*

The question in this case is whether a juvenile court may impose a commitment term that runs consecutively to a previously imposed commitment term when the consecutively imposed commitment is the result of conduct that occurred while youth was in OYA custody for the earlier commitment. Youth argues that the juvenile court does not have the authority to impose consecutive commitment terms because ORS 419C.501 does not expressly grant that authority. The state argues that the statute, in context, impliedly authorizes consecutive commitment terms. For the reasons below, we agree with the state.

## A.  *Mootness*

We first address the fact that youth is no longer in OYA custody nor under the juvenile court's jurisdiction. A case becomes moot when a court's decision will no longer have a "practical effect on the rights of the parties." *Brumnett v. PSRB*, 315 Or 402, 405, 848 P2d 1194 (1993). Often, that occurs because an event "render[s] it impossible for the court to grant effectual relief." *Hamel v. Johnson*, 330 Or 180, 184, 998 P2d 661 (2000) (citation omitted). A party moving for dismissal bears the burden to establish mootness. *State v. K.J.B.*, 362 Or 777, 786, 416 P3d 291 (2018). ORS 14.175 is a statutory exception that provides that a court "may issue a judgment" notwithstanding mootness. It has three requirements: (1) the party had standing to commence the action; (2) the challenged act is capable of repetition; and (3) the act is likely to evade review. *Couey v. Atkins*, 357 Or 460, 476-77, 355 P3d 866 (2015) (stating requirements of ORS 14.175).

While youth's appeal of the juvenile court's second disposition was pending, he completed both the original commitment term and the additional commitment term imposed by the second disposition. Youth is no longer in OYA custody, and that custody was terminated on November 5, 2021.[3] The parties agree that, as a result, this case is moot; our resolution will have no practical effect on either party's rights. However, neither party has moved to dismiss the appeal.

The Court of Appeals issued its opinion in April 2022. The parties did not provide a notice of probable mootness to that court, and that court did not address mootness in its opinion. After the state petitioned for review, we asked the parties to submit briefing on mootness. We then allowed review.

The parties agree that this case is reviewable under ORS 14.175, and that we should exercise our discretion to review. As noted, that provision states that, notwithstanding mootness, the court "may issue a judgment" if:

"(1) The party had standing to commence the action;

"(2) The act challenged by the party is capable of repetition, or the policy or practice challenged by the party continues in effect; and

"(3) The challenged policy or practice, or similar acts, are likely to evade judicial review in the future."

ORS 14.175. When those three requirements are met, the legislature has expressly stated that we may exercise discretion to review the case. *Id.*; *Couey*, 357 Or at 477.

The parties both argue that all three of those requirements are met, and we agree that they are. First, youth had standing to challenge the juvenile court's imposition of the consecutive commitment term because he was in

---

[3] Youth has asked us to take judicial notice of the case registers in youth's other cases, and the state does not object. *Eklof v. Steward*, 360 Or 717, 722 n 4, 385 P3d 1074 (2016) (explaining that OEC 201(b)(2) allows this court to take judicial notice of "sources whose accuracy cannot reasonably be questioned," which included case registers of other cases). We therefore take judicial notice of the fact that, in 2021, the juvenile court terminated OYA custody, ended youth's commitment term, and dismissed five pending petitions against youth, per the judgment entered October 27, 2021, effective November 5, 2021, in case number 14JU03323.

OYA custody at the time that he challenged it. Second, the imposition of that term is capable of repetition in other juvenile delinquency cases involving subsequent misdemeanor counts. *See Penn v. Board of Parole*, 365 Or 607, 622, 451 P3d 589 (2019) (explaining that the capable of repetition requirement is satisfied by a showing that the challenged act is "reasonably susceptible to repetition as to someone"). Third, we agree with the parties that the imposition of consecutive commitment terms is likely to evade judicial review in the future. *See Couey*, 357 Or at 479 (explaining that "likely" means "probable that a similar challenge will evade judicial review in the future"). That is so because many youth commitment terms have a statutory maximum of less than one year. ORS 419C.501(1) (setting maximums of less than one year for acts that would constitute Class A, B, or C misdemeanors if committed by an adult). Given that the appellate process can typically take several years, it is foreseeable that many cases involving consecutive commitment terms for misdemeanor-only cases will become moot on appeal. And for juvenile dispositions involving serious felonies with statutory maximums of 10-20 years, the fact that most youth age out of OYA custody at age 25 makes it less likely that youth in such cases would be subject to consecutive commitment terms imposed by subsequent dispositions. *See* ORS 419C.501(1)(f), (g); ORS 419C.501(2). Therefore, it is likely that the imposition of consecutive commitment terms is likely to evade review in the future. All three requirements of ORS 14.175 are met.

We further conclude that we should exercise our discretion to review the issue in this case. Clarifying the scope of the juvenile court's dispositional authority is important to the public and will have implications for future cases. *See* ORAP 9.07 (setting forth factors to consider in determining whether to allow discretionary review).

It is true that, in some cases, we have remanded to a lower court for consideration of whether it is appropriate to adjudicate an otherwise moot case when that question was not addressed below and when we conclude that the claims are justiciable under ORS 14.175. *See Couey*, 357 Or at 522 (remanding to the circuit court for consideration of

whether it should exercise its discretion to reach the merits when it previously declined to do so), and *Eastern Oregon Mining Association v. DEQ*, 360 Or 10, 19, 376 P3d 288 (2016) (remanding to the Court of Appeals to decide whether it should exercise its discretion to adjudicate the moot case after that court determined that the issues did not raise ORS 14.175 considerations). But that is not always so. *See Penn*, 365 Or at 624 (exercising our discretion to adjudicate the case when the Court of Appeals reached the merits and the case became moot during proceedings before this court). As we explained in *Couey*, ORS 14.175 "leaves it to the court to determine whether it is appropriate to adjudicate an otherwise moot case under the circumstances of each case." 357 Or at 522. The circumstances of this case—including that the Court of Appeals has already reached the merits and neither party has moved to dismiss the appeal as moot—further persuade us to exercise our discretion to review this issue.

B.  *The Authority to Impose Consecutive Commitments Under ORS 419C.501*

        The question in this case is whether ORS 419C.501 authorizes a juvenile court to impose a new, consecutive commitment for an additional offense that occurs while a youth is in OYA custody. That is a matter of statutory construction, which we resolve by giving effect to the intent of the legislature as demonstrated by the text, context, and any helpful legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). In turn, we review the trial court's interpretation of the statute for legal error. *See State v. Ramoz*, 367 Or 670, 704, 483 P3d 615 (2021) ("Questions of statutory construction and a trial court's authority to act *** are questions of law.").

        We begin with the text. ORS 419C.501 governs the duration of dispositions. It also sets specific limits on the period of commitment that a juvenile court may impose for an act. In full, it reads:

    "(1)   The court shall fix the duration of any disposition made pursuant to this chapter and the duration may be for an indefinite period. Any placement in the legal custody of the Department of Human Services or the Oregon

Youth Authority under ORS 419C.478 or placement under the jurisdiction of the Psychiatric Security Review Board under ORS 419C.529 shall be for an indefinite period. However, the period of institutionalization or commitment may not exceed:

"(a)　The period of time specified in the statute defining the crime for an act that would constitute an unclassified misdemeanor if committed by an adult;

"(b)　Thirty days for an act that would constitute a Class C misdemeanor if committed by an adult;

"(c)　Six months for an act that would constitute a Class B misdemeanor if committed by an adult;

"(d)　Three hundred sixty-four days for an act that would constitute a Class A misdemeanor if committed by an adult;

"(e)　Five years for an act that would constitute a Class C felony if committed by an adult;

"(f)　Ten years for an act that would constitute a Class B felony if committed by an adult;

"(g)　Twenty years for an act that would constitute a Class A felony if committed by an adult; and

"(h)　Life for a young person who was found to have committed an act that, if committed by an adult would constitute murder or any aggravated form of murder under ORS 163.095, 163.107, or 163.115.

"(2)　Except as provided in subsection (1)(h) of this section, the period of any disposition may not extend beyond the date on which the young person or adjudicated youth becomes 25 years of age."

ORS 419C.501.

The text of the statute does not expressly address the question before us. It instructs us that the juvenile court must "fix the duration" of a disposition in its order and that placement in OYA custody must be for an indefinite period. *Id*. It limits the period of commitment for each offense level by categorizing conduct that, if committed by an adult, would constitute a crime. *Id*. It also prohibits the juvenile court from imposing a disposition that extends beyond the

adjudicated youth's twenty-fifth birthday (other than in the case of murder or aggravated murder). *Id*. We thus understand the text to authorize the juvenile court to determine the duration of a disposition, with two explicit limitations: A disposition cannot extend past the youth's twenty-fifth birthday, and the term of commitment cannot exceed the statutory maximum listed for "an act."

At issue in this case is the meaning of the latter provision. The use of the indefinite article "an," used with the singular noun "act," could be interpreted in two ways. First, "an" can be used before an unspecified noun—synonymous with "any." *See Lake Oswego Preservation Society v. City of Lake Oswego*, 360 Or 115, 126, 379 P3d 462 (2016). Second, "an" can be used "quantitatively" to signal that the noun is part of a class, whether that class is defined expressly or implicitly in the context in which the indefinite article appears. *Id.* at 126-27. Both interpretations indicate that "an" refers to a single thing—here, a single act. In other words, the statute provides that the juvenile court shall "fix the duration of any disposition" for "an act," but it does not expressly address what should happen in a situation involving multiple acts. Finding limited evidence of the legislature's intent in the text of ORS 419C.501, we turn to the statutory context.

As relevant to this case, the statutory context for ORS 419C.501 includes other provisions of the juvenile code and earlier versions of the statute. *See Dept. of Human Services v. S.J.M.*, 364 Or 37, 54, 430 P3d 1021 (2018) (examining the juvenile code provision at issue in the context of the rest of the juvenile code); *Brown v. SAIF*, 361 Or 241, 254, 391 P3d 773 (2017) (explaining that statutory context includes the entire statutory scheme); *State v. Haley*, 371 Or 108, 112, 531 P3d 142 (2023) (noting that earlier versions of the statute at issue are statutory context). We begin with the juvenile code as a whole, and then turn to the earlier versions of ORS 419C.501.

The juvenile code has multiple provisions that govern a juvenile court's disposition in a delinquency case. ORS 419C.411 lists numerous factors for the juvenile court to consider when determining the appropriate disposition. ORS

419C.446 and ORS 419C.453 provide authority to impose a probation term and limit when detention is authorized. ORS 419C.478 governs placement in OYA custody, listing findings that the court must make before placing a youth in OYA custody. Taken together, the juvenile code gives juvenile courts broad authority to determine the appropriate disposition in each individual case. As we explain below, the statutory context indicates that juvenile courts have the authority to impose, when appropriate, commitment terms for subsequent offenses so long as the duration of each term does not exceed the maximum for the offense for which it is imposed.

As noted, when determining an appropriate disposition, the court must consider numerous factors set out in the statute. ORS 419C.411. Those factors include the gravity of loss or injury from the youth's act, the level of aggression or willfulness, whether the youth was held in detention, the need to protect the victim, and the youth's previous juvenile court record. ORS 419C.411(3). In addition, the juvenile court "may" consider the youth's efforts toward reform, educational status, and employment history, the youth's proposed disposition, recommendations from the state, statements from the victim, the youth's mental, emotional, and physical health, the results of substance abuse treatment, and "[a]ny other relevant factors or circumstances raised by the parties." ORS 419C.411(4). In other words, the juvenile court has broad authority to assess the unique needs of each case and impose an appropriate disposition based on those needs.

Other provisions regarding dispositions further support that understanding. The court has authority to direct the youth to remain in the legal custody of the youth's parents, to be placed in the legal custody of a relative or a foster home, or to be placed in the legal custody of a care center when imposing a probation term. ORS 419C.446. The court is charged with making that determination in the "best interest and welfare" of the youth. *Id.* The court is also authorized to commit a youth to OYA custody, and, in specific circumstances, to detain a youth in a jail-like detention setting for specified periods of time. ORS 419C.478

(commitment to OYA custody); ORS 419C.453 (authorizing detention). The statutes give the court significant latitude to determine what kind of supervision the youth should be placed in, based on the youth's conduct, and to fashion appropriate conditions during a placement.

The juvenile code instructs the juvenile court to determine whether OYA custody is in the youth's best interests, and to determine the services and conditions that the youth must receive and adhere to during youth's term of commitment to OYA. As discussed above, when the juvenile court determines that OYA custody is appropriate, ORS 419C.501 requires the juvenile court to commit the youth to OYA custody for an indefinite period. Thus, the statutory scheme clearly contemplates a broad, holistic analysis of the circumstances in the court's determination of conditions, treatment programs, and legal custody. The court's authority to make those determinations is subject to limits that are expressly stated in the statute. Those limits include a requirement that a youth's period of commitment for "an act" not exceed the statutory maximum sentence that would apply to an adult who engaged in the same conduct. Nothing in the statute suggests that the court's authority to set the duration of the commitment term is constrained beyond the limits that the juvenile code explicitly provides. More to the point, nothing in the text of the statute precludes a new "act," committed while a youth is already committed to the custody of OYA, from being addressed in a new disposition with its own, separate period of commitment.

In short, the juvenile code entrusts the juvenile court with broad authority to impose an appropriate disposition given the facts and circumstances of each case. The limitations on that authority that the code does provide are quite explicit. *See, e.g.*, ORS 419C.478(5) ("[T]he court may not make a commitment directly to any residential facility."). If the legislature had intended to limit the court's authority to impose dispositions for subsequent offenses in the manner that youth contends, it could have done so. But nothing in the text of the juvenile code suggests that it has done that, or that it intended to do that.

In addition to related statutes, our inquiry into the statutory context includes earlier versions of the same statute. We now turn to the versions of ORS 419C.501 that existed prior to the current version, which was last substantively amended in 1999. As explained below, those earlier versions demonstrate that the legislature has consistently given broad discretionary authority to the juvenile courts to determine the "appropriate" disposition in each case.

The first juvenile code was enacted in 1959. Or Laws 1959, ch 432. *Former* ORS 419.511 (1959), *repealed by* Or Laws 1993, ch 33, § 373, provided broad authority for the juvenile court to set an indefinite term of commitment, limited only by the youth reaching 21 years of age. Or Laws 1959, ch 432, §§ 17, 19. The first substantive amendment relevant to understanding maximum periods of commitment was in 1971. The legislature amended the statute to provide that a youth's indefinite term of commitment could not exceed the statutory maximum sentence that an adult would receive for the same conduct. Or Laws 1971, ch 571, § 1. In making that determination, the legislature considered the current practice of juvenile courts in addition to arguments both for and against the bill, Senate Bill (SB) 138 (1971). Tape Recording, Senate Committee on Judiciary, SB 138, Mar 12, 1971, Tape 3, Side 2. According to testimony before the Senate Judiciary Committee, some cases had resulted in a youth being committed to incarceration from age 15 to age 21, when an adult would have been sentenced to 60 days in jail for the same conduct. *Id.* Proponents of the bill understood the proposed connection to the statutory maximums in adult sentences to apply to youth in Corrections Division custody (now OYA), and not to other types of dispositions. *Id.*; *see generally* Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report §§ 74, 75 (July 1970) (stating the maximum terms for indeterminate sentences under the revised criminal code). In keeping the mandatory indefinite term of commitment, but providing an upper limit on that term of commitment, proponents of the bill understood it to still provide enough flexibility for the Corrections Division to release a youth at the point in time that the youth was rehabilitated, without committing a youth for months or years longer than

an adult would serve for the same conduct. We could find no discussion in the legislative history of SB 138 of consecutive terms of commitment for subsequent offenses.

We understand the 1971 amendment to reflect the legislature's intent to prevent youths from being committed to the Corrections Division for a longer period of time than adults would serve for engaging in the same conduct. The concerns driving opposition to the bill were that, in some circumstances, it might be in a youth's best interest to be committed to OYA custody for a longer period of time than would apply to an adult. Tape Recording, Senate Committee on Judiciary, SB 138, Mar 12, 1971, Tape 3, Side 2. The text of the law, as passed, indicates that the desire to achieve "equal treatment" between youths and adults for the same conduct carried the day.

Thus, the governing law beginning in 1971 was that a disposition that placed a youth in the legal custody of OYA (then, the Children's Services Division and formerly the Corrections Division) was required to be for an indefinite period not to exceed the maximum term of incarceration for an adult who engaged in the same conduct. The legislative history of the 1971 version of the statute suggests that the legislature understood the juvenile court's dispositional authority to be broad—it could impose any disposition it determined was appropriate unless the legislature provided an express limitation.

In 1976, the Court of Appeals decided a case interpreting that statute, *former* ORS 419.511(1) (1971), and answered a question similar to the one presented here. *T.*, 27 Or App at 409. In that case, the youth was adjudicated in a single hearing for two counts of unrelated conduct that, if committed by an adult, would have constituted theft in the second degree. *Id.* The juvenile court's disposition committed the youth to the Children's Services Division for placement in the juvenile training school for a period not to exceed one year for each count. *Id.* The counts were imposed to run consecutively. The Court of Appeals held, without explanation, that imposing consecutive commitment periods for multiple offenses was not improper. *Id.*

Thus, prior to 1999, the juvenile code granted the juvenile court the authority to impose an appropriate disposition, subject to an age limitation and a prohibition on committing a youth to custody for a longer period of time than an adult would be incarcerated for the same conduct. That authority, as illustrated by *T.*, was understood to encompass the ability to impose consecutive periods of commitment for multiple acts. The legislature made no amendments to the statute to change that practice. Consequently, from 1971 through 1999, controlling law was that the legislature's grant of broad authority to juvenile courts included the authority to impose consecutive commitment periods. In 1999, the legislature again amended the statute, enacting the text in its current form.

The 1999 legislature removed the text that tied the statutory maximum for juvenile commitments to the statutory maximum for adult criminal sentences. Or Laws 1999, ch 964, § 1. It replaced that text with a specific list of durational limits per offense, which remain in the current version of the statute. *Id.* The legislative history illustrates that the impetus for the 1999 amendment was a pending Court of Appeals case. Exhibit B, House Committee on Judiciary, HB 3047, May 4, 1999 (testimony of Oregon Juvenile Department Directors' Association Larry Oglesby). The question in that pending case was whether the maximum period for a youth's commitment was to be determined by the *statutory* maximum for an adult, or by the actual maximum time that an adult would serve under the sentencing guidelines. *Id.* According to the proponents, the purpose of the bill was to "make certain that the practice that has been in place successfully for decades would continue," so that a youth would not be released back into the community "prematurely" based on calculations applicable to adults under the sentencing guidelines. *Id.* In the House of Representatives, the bill was described as a "technical fix" to "make certain" that a youth can be "kept" in commitment up to the statutory maximum for an adult, regardless of the effects of the sentencing guidelines in adult cases. Tape Recording, House of Representatives, HB 3047, May 19, 1999, Tape 139, Side B (comments of Rep Prozanski). The bill was passed without further discussion. *Id.*

It is therefore clear that the legislature's intent in 1999 was to maintain the status quo regarding juvenile courts' authority to impose periods of commitment, in the face of a pending appellate case that might have disrupted that status quo. That status quo included the juvenile court's authority to impose consecutive periods of commitment, as expressly allowed by the Court of Appeals' 1976 decision in *T.* The 1999 amendment contains no text bearing on that specific issue. And, nothing in the context or legislative history suggests that the legislature intended to disturb the juvenile court's authority to impose consecutive commitments in a single disposition, or to otherwise limit the juvenile court's authority to impose consecutive commitments when subsequent offenses are involved, adding the maximum term for the subsequent offense to the maximum term for the earlier offense for purposes of determining the new appropriate disposition.

The majority in the Court of Appeals concluded otherwise. It similarly examined the prior versions and the legislative history, but it concluded that this case presented "an issue of ambiguous legislative intent." 319 Or App at 216-17. It explained that *T.*'s rationale was rooted in the inherent authority of criminal courts. However, it concluded that that authority had later been limited in the criminal context by ORS 137.123 in 1987. Or Laws 1987, ch 2, § 12. ORS 137.123 provided, and still provides, that consecutive sentences are authorized only in the circumstances provided by that statute (*e.g.*, where multiple offenses "do not arise from the same continuous and uninterrupted course of conduct," ORS 137.123(2)). The majority then reasoned that, because the enactment of ORS 137.123 "reflected an intent to impose limitations on a court's authority to impose consecutive sentences in the adult context," *B.Y.*, 319 Or App at 216, an underlying premise of *T.*'s rationale no longer existed. The majority ultimately determined that the legislature's intent on the question presented here was "ambiguous." *Id.* at 216. Invoking a maxim of construction that asks what "result the legislature would have most likely wanted had it thought of the specific issue," it concluded that the 1999 legislature would not have intended for juvenile courts to have authority to impose consecutive commitments. *Id.*

We reach a different conclusion. As noted above, the statutory text neither expressly permits nor expressly prohibits the imposition of consecutive commitments. The statutory scheme does, however, confer broad authority on the juvenile court to fashion appropriate dispositions; that stands in contrast to the criminal code, where courts' sentencing authority is more circumscribed. Given that contrast, the fact that the legislature did not explicitly provide for consecutive commitments in a circumstance such as this is unsurprising. In light of the wide latitude that the legislature has chosen to give juvenile courts, it is more reasonable to expect that if the legislature had intended to *limit* the juvenile court's ability to impose consecutive commitments in this circumstance, the legislature would have indicated as much.

The legislature did impose limits on criminal courts' ability to impose consecutive sentences in *adult* cases. Those limits were created in 1987, as noted above. By then, it had been established law for 11 years, since the Court of Appeals' 1976 decision in *T.*, that juvenile courts could impose consecutive commitments. We presume that the 1987 legislature was aware of that rule, yet it took no action to extend the new restrictions it was creating in the adult criminal context to the juvenile code. *See Blachana, LLC v. Bureau of Labor & Industries*, 354 Or 676, 691, 318 P3d 735 (2014) ("We presume that the legislature was aware of existing law[.]").

More significantly, when the legislature next amended the juvenile code in 1999, it did so without indicating any intent to limit the authority recognized in *T.* or have any bearing on the authority to impose consecutive commitments for subsequent dispositions. Rather, it reveals that the legislature's concern at that time was that youth commitments should not be *shortened* based on a rationale that the Court of Appeals was considering in a pending case.

We conclude from the text, context, and legislative history that the legislature did not intend to prevent juvenile courts from imposing consecutive periods of commitment in circumstances like those here, where a youth was adjudicated for conduct that occurred while he was already

in OYA custody. Although the text of ORS 419C.501 does not expressly grant that authority, we are persuaded that this interpretation is most consistent with the purpose and operation of the juvenile code, as expressed in statute and previously articulated by this court. *See State ex rel. Juv. Dept. v. Reynolds*, 317 Or 560, 574, 857 P2d 842 (1993) ("Juvenile courts are concerned with rehabilitation, not punishment."). The code was "founded on the principles of personal responsibility, accountability and reformation within the context of public safety." ORS 419C.001. The discretionary authority that we recognize in this case is not in furtherance of additional "punishment," but rather in furtherance of ensuring that the juvenile courts retain the authority that the legislature intended them to have—discretionary authority to determine the appropriate disposition based on the specific circumstances and rehabilitative needs of the youth in each case.

We also find youth's arguments to the contrary unavailing. Youth's primary argument is that the juvenile code is "*sui generis*"; therefore, if the legislature did not expressly grant the juvenile court the authority to impose consecutive commitments, the juvenile court does not have that authority. Stating that a statutory scheme is *sui generis*, or "of its own kind," implies no specific legal consequence. Here, it is a description of the statutory scheme that conveys the idea that the juvenile delinquency code is neither purely civil nor purely criminal. *See Reynolds*, 317 Or at 575 (explaining that the juvenile code changed the way juveniles were treated and created a proceeding that is "*sui generis*"). It does not follow that every aspect of a juvenile court's authority must be explicitly delineated in statute; some specific powers can be reasonably inferred.

Because we conclude from the text, context, and legislative history that the legislature's intent is clear, we do not address youth's remaining arguments invoking substantive maxims of statutory construction. *Coos Waterkeeper v. Port of Coos Bay*, 363 Or 354, 371-72, 423 P3d 60 (2018).

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed in part and reversed in part.