No. 730       October 16, 2024       477

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of T. J. L.,
a Youth.
STATE OF OREGON,
*Respondent,*

*v.*

T. J. L.,
*Appellant.*

Linn County Circuit Court
21JU03904; A177663

Brendan J. Kane, Judge.

Argued and submitted June 14, 2023.

Ginger Fitch argued the cause for appellant. Also on the briefs was Youth, Rights & Justice.

Patricia G. Rincon, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.*

AOYAGI, P. J.

Affirmed.

_____
\* Egan, J. *vice* Jacquot, J.

**AOYAGI, P. J.**

Youth appeals a delinquency judgment committing him to the legal custody of the Oregon Youth Authority (OYA) for placement in a correctional facility. While driving under the influence of alcohol and marijuana, youth, aged 17, caused a crash that killed his friend. The juvenile court adjudicated youth for conduct that would constitute second-degree manslaughter and driving under the influence of intoxicants if committed by an adult, and it committed him to OYA custody. On appeal, youth assigns error to the disposition "removing [him] from his community and placing him in a correctional facility." He argues that the court improperly "focused on the nature of [youth's] offense and its deadly harm," instead of youth's best interests as required by ORS 419C.478, and that it "is in this youth's best interests to receive treatment for his severe alcohol use disorder in the community." We conclude that the court did not err and therefore affirm.

Youth's adjudication and disposition hearing took place in December 2021. *See State v. B. Y.*, 371 Or 364, 370, 537 P3d 517 (2023) ("The 'disposition' is the judgment of the juvenile court that imposes conditions on the adjudicated youth for the purpose of that youth's rehabilitation. ORS 419C.411. The disposition, like the one in this case, may include a commitment to OYA custody. ORS 419C.478."). There was evidence that youth had been drinking alcohol and smoking marijuana since age nine and that, in the year prior to the July 2021 crash, he was drinking 18 to 30 beers per day and experiencing blackouts, while living at home and working full time, having dropped out of school. At some point, youth lost a job due to a failed urinalysis (UA). After the crash that killed his friend, youth stopped drinking for two weeks "due to this current pending case," then resumed drinking. During a substance-abuse evaluation two months after the crash, youth reported that he understood that he drinks "in excess" and that his goal for alcohol use is "moderation."

Both youth's parents and the victim's parents made statements at the hearing. Youth's parents reported that they had never seen youth drink alcohol, were unaware of

his drinking, and do not allow him to drink in their home. The victim's parents urged the court to place youth in a correctional facility, with the victim's mother explaining that doing so would allow their family to start to heal and grieve their loss without having "to constantly worry about what [youth] will do next."

At the time of the hearing, youth was in preadjudication detention and, by all reports, doing well. He had obtained his general equivalency degree (GED) and stopped drinking while in detention.

Youth admitted to the adjudicative allegations, and he requested that he be placed on "community probation" with "comprehensive treatment services, counseling, ankle monitors, breathalyzer, work crew, [and] [A]ntabuse." The state's position was that OYA custody with a correctional-facility placement would be best for youth, because it would protect him "from the risk of harming himself through getting intoxicated and whatever else he might do while intoxicated." The state pointed out that living with his parents had not deterred youth from drinking before or after the accident, and it argued that local supervision and treatment in a nonsecure facility would not be appropriate given youth's "recent past conduct in the context of these offenses."

The juvenile court decided that it is in youth's best interests to be placed in the legal custody of OYA. The court explained its ruling at length, including, among other things:

- agreeing with youth's counsel that the goal in deciding the disposition should not be "retribution for the victim";

- acknowledging "the purpose of the juvenile court system," which had been "well articulated" by youth's counsel, and the "many studies about what's best" for delinquent youth;

- identifying facts that it considered important to the disposition for this youth, including that youth is now 18 and no longer "subject to the direction of [his parents]" like a minor would be, that youth has abused substances for a long time and was not fully in his parents' control even as a minor, and that youth's conduct and its consequences were "the most serious" possible;

- noting that youth has done well in pre-adjudication detention; and

- concluding that community placement, as requested by youth, is not "appropriate nor in [youth's] best interest, as being in the community did not serve him well prior to the accident," particularly given his longstanding substance abuse problem and his dropping out of school.

The court further decided that a correctional facility is the preferred placement, given OYA's inability to find a residential treatment program that would accept youth, at least until he has a period of stability, as demonstrated by five failed referrals. *See* ORS 419C.478(2) (when the juvenile court places an adjudicated youth in the legal custody of OYA, it "may specify the type of care, supervision or services to be provided" by OYA, "but the actual planning and provision of the care, supervision, security or services is the responsibility of [OYA]"). The court explained that youth needs close supervision, including prompt responses to any further transgressions, to ensure his reformation. That is especially so given that his prior "transgression was of such a stark and violent nature that it leaves no margin for error to assure that the community is safe, [youth] is safe, and that a tragedy like this does not occur again in [youth's] life[.]" The court further stated that youth could not achieve at home the "kind of accountability that's required in the Juvenile Code"[1] and that it will "serve [youth] in his future" to understand that "there are some things that you don't do" and that losing a job for failing a UA is one thing but taking a life is another and that a life cannot be replaced like a job.

The court made some encouraging remarks to youth, then ended with a summary of the reasons that it believed that it is in youth's best interests to be placed in OYA custody with a correctional placement:

---

[1] The court was referencing ORS 419C.001, which identifies the purposes of the Oregon juvenile justice system; states that the "system is founded on the principles of personal responsibility, accountability and reformation within the context of public safety and restitution to the victims and to the community"; and states that the system "shall provide a continuum of services that emphasize prevention of further criminal activity by the use of early and certain sanctions, reformation and rehabilitation programs and swift and decisive intervention in delinquent behavior."

"Youth's decision making has jeopardized himself, the community, and has caused the greatest harm possible. Youth would benefit from the accountability as detailed on the record of the proceedings and reformative services that commitment to the [OYA] correctional facility will provide, including early and swift response to future transgressions, a sufficient period of stability and sobriety, and treatment and vocational opportunities."

The court subsequently issued an order committing youth to OYA, which included best-interests findings materially identical to the court's concluding statement quoted above.

On appeal, youth challenges the disposition, arguing that the juvenile court erred by "removing [youth] from his community and placing him in a correctional facility." Although it is not entirely clear, it appears that youth means to challenge both the sufficiency of the juvenile court's written findings and the substance of its ruling.[2]

We review the sufficiency of the court's written findings for legal error. *State v. D. B. O.*, 325 Or App 746, 748, 529 P3d 1004 (2023). Although youth does not directly assign error to the written findings, youth argues prominently, albeit briefly, that the court was required to make written findings regarding what placement is in his best interests, that the court improperly injected the idea of "accountability" into its best-interests findings, and that we "should reverse and remand with directions to the juvenile court to separate the consideration of [youth's] best interest regarding placement from the consideration of accountability."

Under ORS 419C.478(1), a juvenile court placing a youth in OYA custody must include in its order "written findings describing why it is in the best interests of the adjudicated youth to be placed with" OYA. It is legal error not to make the required written findings, irrespective of whether the record would support OYA custody. *D. B. O.*, 325 Or App at 748 (vacating and remanding due to insufficient written findings under ORS 419C.478(1)); *see also, e.g.*, *State v. E. S.*, 333 Or App 350, 552 P3d 754 (2024) (same). In this case, we

_____

[2] For the benefit of the bar, we note that, when seeking to challenge both the sufficiency of the written findings and the substance of the dispositional ruling, the better practice is to assign error separately. *See* ORAP 5.45 (regarding assignments of error).

disagree with youth that the court's reference to "accountability" in its written findings causes those findings not to comply with ORS 419C.478(1). As discussed more later, we understand the juvenile court to have referred to accountability in the reformative sense. We therefore reject youth's narrow challenge to the sufficiency of the written findings under ORS 419C.478(1).

We turn to the substance of the court's placement ruling, which is the subject of the vast majority of youth's argument. Under ORS 419C.478(1), the juvenile court "may, in addition to probation or any other dispositional order, place an adjudicated youth who is at least 12 years of age in the legal custody of [OYA] for care, placement and supervision[.]" As previously noted, the court must make written findings as to "why it is in the best interests of the adjudicated youth to be placed with [OYA]." ORS 419C.478(1). By necessary implication, that means that, before placing a youth in OYA custody, the court must determine that doing so is in the youth's best interests.

We review the juvenile court's dispositional decision regarding placement of a delinquent youth for abuse of discretion. *See B. Y.*, 371 Or at 378 (discussing the juvenile court's "discretionary authority to determine the appropriate disposition based on the specific circumstances and rehabilitative needs of the youth in each case"). We will reverse a discretionary ruling only if it falls outside the range of legally permissible options, keeping in mind that there is often more than one legally permissible choice when discretion is at play. *State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000) ("If the trial court's decision was within the range of legally correct discretionary choices and produced a permissible, legally correct outcome, the trial court did not abuse its discretion."); *Sjomeling v. Lasser*, 251 Or App 172, 187, 285 P3d 1116, *rev den*, 353 Or 103 (2012) (reversal is proper "only if a trial court's discretionary determination is not a legally permissible one").

Youth views the juvenile court as having focused too much on the fatal consequences of his adjudicated conduct in making its placement decision. Youth acknowledges in his reply brief that "there is no inherent conflict

between accountability and a child's best interest." Youth argues, however, that the juvenile court focused too much here on the nature of the adjudicated conduct and the need for accountability, essentially trying to achieve punishment rather than rehabilitation and starting with the most restrictive placement instead of the least restrictive one.

The state disagrees. It points out that the juvenile court is expected to consider a variety of factors in deciding the disposition in a delinquency case. Under ORS 419C.411(3), there are five factors that the court must consider, including, *inter alia*, the "gravity" of the injury caused by the youth's adjudicated conduct, the "manner" in which the youth engaged in the conduct, and the need to protect the victim's family and the community.[3] The court also may consider a multitude of other factors under ORS 419C.411, including, *inter alia*, the youth's efforts toward reform or rehabilitation, the youth's educational status and school attendance record, the youth's employment record, the parties' recommendations regarding disposition, statements by the victim's family, and "[a]ny other relevant factors or circumstances raised by the parties."[4] The state argues that,

---

[3] In full, ORS 419C.411(3) states:

"Except as otherwise provided in subsections (6) and (7) of this section [(which pertain to youth found responsible except for insanity)] in determining the disposition of the case, the court shall consider each of the following:

"(a) The gravity of the loss, damage or injury caused or attempted during, or as part of, the conduct that is the basis for jurisdiction under ORS 419C.005;

"(b) Whether the manner in which the adjudicated youth engaged in the conduct was aggressive, violent, premeditated or willful;

"(c) Whether the adjudicated youth was held in detention under ORS 419C.145 and, if so, the reasons for the detention;

"(d) The immediate and future protection required by the victim, the victim's family and the community; and

"(e) The adjudicated youth's juvenile court record and response to the requirements and conditions imposed by previous juvenile court orders."

[4] In full, ORS 419C.411(4) states:

"In addition to the factors listed in subsection (3) of this section, the court may consider the following:

"(a) Whether the adjudicated youth has made any efforts toward reform or rehabilitation or making restitution;

"(b) The adjudicated youth's educational status and school attendance record;

here, the juvenile court properly considered accountability as one relevant factor and did not abuse its discretion in determining that it is in youth's best interests to be committed to OYA custody, with initial placement in a correctional facility.

As a general matter, youth is correct that Oregon's juvenile justice system is concerned with rehabilitation, not punishment, a point made frequently over the years in the case law. *See, e.g.*, *B. Y.*, 371 Or at 383 (holding that juvenile courts have authority to impose consecutive commitment periods when a youth is adjudicated for new conduct that took place while in OYA custody, but noting that such discretionary authority "is not in furtherance of additional 'punishment,' but rather in furtherance of ensuring that the juvenile courts retain the authority that the legislature intended them to have—discretionary authority to determine the appropriate disposition based on the specific circumstances and rehabilitative needs of the youth in each case"); *State ex rel Juv. Dept. v. Reynolds*, 317 Or 560, 574, 857 P2d 842 (1993) ("Juvenile courts are concerned with rehabilitation, not punishment."); *State v. S. Q. K.*, 292 Or App 836, 846, 426 P3d 659, *adh'd to as modified on recons*, 294 Or App 184, 426 P3d 258, *rev den*, 364 Or 209 (2018) ("[J]uvenile delinquency proceedings are not criminal proceedings but are, instead, something quite different—proceedings to rehabilitate children."). As the Oregon Supreme Court observed in 1993, "Unlike many states that recently have shifted their focus from juvenile rehabilitation to juvenile accountability and punishment, Oregon has remained faithful to its original emphasis on the rehabilitation of delinquent youth." *Reynolds*, 317 Or at 568.

Given Oregon's focus on rehabilitation rather than punishment for juvenile offenders, it is important to

"(c) The adjudicated youth's past and present employment;

"(d) The disposition proposed by the adjudicated youth;

"(e) The recommendations of the district attorney and the juvenile court counselor and the statements of the victim and the victim's family;

"(f) The adjudicated youth's mental, emotional and physical health and the results of the mental health or substance abuse treatment; and

"(g) Any other relevant factors or circumstances raised by the parties."

acknowledge that the term "accountability" can be used in different ways. For example, it can be used to express the idea that taking personal responsibility for wrongdoing is important to personal growth and reformation, which is in line with the goal of rehabilitation. Or it can be used as essentially a synonym for punishment, conveying that people who engage in criminal activity should be punished so that they are held accountable to their victims and to society more generally. In this case, having read the entire record, we understand the juvenile court to have considered accountability as relevant to youth's reformation, rather than punishment.

The court provided a thoughtful ruling demonstrating its consideration of a number of factors relevant to the disposition, including, but by no means limited to, youth's need for accountability to serve *youth's* best interests in the long term. *See State ex rel Juvenile Dept. v. Lauffenberger*, 308 Or 159, 777 P2d 954 (1989) (recognizing, in the juvenile dependency context, that "best interests" refers to a child's interests in both the short term and long term); *see also, e.g.*, *State v. N. R. L.*, 249 Or App 321, 332, 277 P3d 564 (2012) (explaining that ordering restitution in juvenile delinquency cases can serve a rehabilitative purpose, "by holding the youth offender accountable for his or her actions" and impressing upon the youth "the seriousness and cost of his offense" (internal quotation marks omitted)). We do not view the court as having conflated punishment with accountability, as youth contends, or as having lost sight of the need to determine what placement was in youth's best interests. Rather, we view it as having appropriately weighed a number of considerations as contemplated by ORS 419C.411, in a difficult case, to decide how best to ensure that youth will obtain the treatment that he needs while remaining under close enough supervision to avoid another tragedy, including one that might lead to youth's own serious injury or demise.[5]

---

[5] Youth argues for a "presumption" of parental placement for youth offenders adjudicated in juvenile court. We reject that framing. ORS 419C.446(1) authorizes a variety of different community placement options for youths on probation, without any stated preference among them. As for non-OYA custody versus OYA custody, ORS 419C.478(1) requires a finding that it is in the youth's "best interests" to be committed to the legal custody of OYA. While that may effectively serve as a preference for non-OYA custody, we see no reason to characterize the

On this record, the juvenile court did not abuse its discretion in deciding that keeping 18-year-old youth with his parents in the community is not in youth's best interests, that placement in a residential treatment program in the community is not an available option, and that OYA custody with an initial placement in a correctional facility is ultimately what is in youth's best interests.[6] Youth may have a different view of what is in his best interests, but the court did not abuse its discretion in ruling as it did.

Affirmed.

---

statutes as creating a "presumption" of non-OYA custody that the court must "overcome" or that the state must rebut. We view it as more accurate and more useful to speak in the statutory terms of youth's "best interests."

[6] Youth suggests that the juvenile court could have committed him to the legal custody of OYA but physically placed him with his parents. An OYA witness testified to why that is not a viable option, including explaining that OYA custody is typically reserved for youth who cannot be maintained at home. On this record, the court properly understood the available options to be keeping youth at home with his parents or committing him to OYA custody with initial placement in a correctional facility.